Edward ARCENEAUX, Thomas Williams, Steven Gallodora, Leroy Gray, Raymond Gray, Sr., Charles Stevens, Charles W. Buggage

v.

Edwin W. EDWARDS, et al.

Civ. A. No. 79–4875.

United States District Court, E. D. Louisiana.

May 30, 1980.

Supplemental Reasons For Judgment June 26, 1980.

Mark G. Murov, M. David Gelfand, New Orleans, La., for plaintiffs.

Donald Ensenat, Joe Giarrusso, Jr., Asst. Atty. Gen., State of Louisiana, New Orleans, La., for defendants.

James A. McPherson, New Orleans, La., for Louisiana Common Cause.

DUPLANTIER, District Judge.

This is an action for declaratory and injunctive relief against the enforcement of certain provisions of Louisiana's Dual Officeholding and Dual Employment Act (the Act).[1] Pursuant to rule 65(a)(2), Fed.R. Civ.P., plaintiffs' claims for a permanent injunction against the Act's enforcement and for a declaratory judgment that the Act is unconstitutional were submitted to the court along with the motion for preliminary injunction.[2] Defendants have agreed not to enforce the Act against plaintiffs or others similarly situated pending the outcome of this litigation.

There is no factual dispute involved; only a question of law, i. e., the constitutionality of the Act as applied to persons in plaintiffs' circumstances.

1. Act No. 700 of 1979, Louisiana Revised Statutes 42:61–66, hereinafter cited as La.R.S.

2. The case was instituted as a class action. However, the court has deferred consideration of class certification pending the decision herein on injunctive and declaratory relief. The court has also deferred consideration of the issue of plaintiffs' entitlement to attorney fees.

The Act's far-reaching prohibitions on dual officeholding and employment are set forth in La.R.S. 42:63:

§ 63. Prohibitions

A. No person holding an elective office, appointive office, or employment in any of the branches of state government or of a political subdivision thereof shall at the same time hold another elective office, appointive office, or employment in the government of a foreign country, in the government of the United States, or in the government of another state.

B. Except as otherwise provided by the Louisiana constitution, no person holding office or employment in one branch of the state government shall at the same time hold another office or employment in any other branch of the state government.

C. No person holding an elective office in the government of this state shall at the same time hold another elective office, a full-time appointive office, or employment in the government of this state or in the government of a political subdivision thereof.

D. No person holding an elective office in a political subdivision of this state shall at the same time hold another elective office or full-time appointive office in the government of this state or in the government of a political subdivision thereof. No such person shall hold at the same time employment in the government of this state, or in the same political subdivision in which he holds an elective office. In addition no sheriff, assessor, or clerk of court shall hold any office or employment under a parish governing authority or school board, nor shall any member of any parish governing authority or school board hold any office or employment with any sheriff, assessor, or clerk of court.

E. No person holding a full-time appointive office or full-time employment in the government of this state or of a political subdivision thereof shall at the same time hold another full-time appointive office or full-time employment in the government of the state of Louisiana, in the government of a political subdivision thereof, or in a combination of these.

In particular, plaintiffs challenge subsections A and E of the Act as applied to those such as themselves who hold two low-level, non-policymaking government jobs. Because they are relevant to our discussion of the various classifications made by the Act, we set forth briefly the facts as to each individual plaintiff.

Edward Arceneaux is the manager of a housing project for the Housing Authority of New Orleans. His hours as such are 8 to 5, Monday through Friday, and he earns approximately $15,000.00 per year. Arceneaux also works as a custodian for the City of New Orleans, Monday through Friday, from 5 p. m. until midnight, earning about $400.00 per month.

Charles Buggage is a teacher for the Orleans Parish School Board, working Monday through Friday, 8:30 a. m. to 3:15 p. m., and earning approximately $14,000.00 for nine months. He also works in the evenings as a custodian for the City of New Orleans, 5 p. m. to midnight, earning $400.00 per month.

Leroy Gray is an Assistant Principal for the Orleans Parish School Board; his salary is $20,000.00 for nine months work, Monday through Friday, between 8:15 a. m. and 3:45 p. m. Gray also works for the City of New Orleans from 5 p. m. until midnight, as a custodian supervisor, earning about $7,000.00 per year.

Raymond Gray, Sr., works by day, Tuesday through Saturday, 6:30 a. m. to 3:00 p. m., as a letter carrier for the U.S. Postal Service, earning about $18,000 per year. Like his brother, Leroy Gray, he is a custodian supervisor for the City of New Orleans in the evenings, earning approximately $7,200.00 per year.

Charles Stevens' day-time employment is as a maintenance supervisor for the Housing Authority of New Orleans. His hours are 8:00 a. m. to 5:00 p. m., Monday through Friday. On weekday evenings he is a custodian for the city, a position similar to those held by Arcenaux and Buggage.

Thomas Williams supervises mentally retarded children for the Plaquemine Parish School Board, working Sunday through Thursday, 6:30 a. m. to 2:30 p. m. On Weekday evenings he works as a custodian for the City of New Orleans, in a position similar to those of Arceneaux, Buggage and Stevens.

Finally, plaintiff Steven Gallodora works both as a captain in the New Orleans Fire Department and part-time for the U.S. Postal Service.

Thus, plaintiffs Raymond Gray, Sr., and Gallodoro fall within the prohibitions of subsection A of La.R.S. 42:63, while the other five named plaintiffs fall within subsection E's prohibitions. Section Five of the Act would require that plaintiffs vacate one of their positions.[3]

All of the plaintiffs have held their dual positions for a number of years. Moreover, the court finds that loss of either of their jobs would substantially affect the ability of each of these plaintiffs to support their families.

Plaintiffs challenge the constitutionality of the Act on four grounds.

### 1. Contracts Clause

Plaintiffs' first argument is that certain provisions of the Louisiana Constitution,[4] of state statutes[5], and of collective bargaining agreements[6] constitute a contractual agreement by the state that persons in plaintiffs' positions will not be dismissed without "just cause." They argue that the enforcement of the Act is an impairment of the state's obligations under these "contracts" in violation of The United States Constitution, Article I, Section 10: "No state shall . . . pass any . . . Law impairing the Obligation of Contracts."

The first determinations to be made in a Contracts Clause claim are whether there is a contractual obligation, and, if so, the nature of that obligation.

■ The court concludes that the provisions relied upon in this case do not constitute a contractual obligation on the part of the state so as to invoke the Contracts Clause. Alternatively, assuming that these provisions do constitute a contract by the state, we hold that the terms of that contract do not bar the enforcement of the Act.

Plaintiffs have not cited any case to support their argument that the civil service and tenure provisions relied upon are contracts by the state of Louisiana. These provisions do grant certain rights against arbitrary discharge. However, they are not contracts in the sense of, for example, a state's obligation to pay its bonded indebtedness.

However, even assuming *arguendo* that those provisions are contracts by the state, they clearly were not meant to prohibit the passage and subsequent enforcement of the Act involved in this case. These provisions are designed to protect individuals against arbitrary discharges. They were not designed to protect plaintiffs from future legislative acts defining the qualifications for or placing limitations upon public employment.

---

3. Section 5. Any person who on the effective date of this Act holds a combination of employments prohibited by this Part shall vacate all but one of the employments within ninety days after the provisions of this Act become effective.

4. La. Constitution of 1921, Art. 14, § 15(N)(1):
   (N)(1). Employees' rights and obligations; dismissal, etc., for cause. No person in the State or Classified Service, having acquired permanent Civil Service status, shall be demoted, dismissed, or discriminated against, except for cause, expressed in writing by the appointing authority. (a) The burden of proof on appeal, as to the facts, shall be on the employee.

La. Constitution of 1974, Art. 10 § 8(A):
   § 8. Appeals
   Section 8. (A) Disciplinary Actions. No person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing. A classified employee subjected to such disciplinary action shall have the right of appeal to the appropriate commission. The burden of proof on appeal, as to the facts, shall be on the appointing authority.

5. La.R.S. 17:462–64, 521–525

6. See exhibits 1–5

If the Contracts Clause could be invoked to invalidate the Act, then every statute, regulation, or policy which changes conditions or terms of employment of public employees would be subject to such attack. This is certainly not the intent of the Contracts Clause, nor of the state constitutional or statutory provisions relied upon by plaintiffs.

It is true that the Contracts Clause, long dormant as a source of substantive rights, seems to have been given new vitality in two recent decisions of the United States Supreme Court: *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) and *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). However, those cases are clearly distinguishable from the case *sub judice*. *Allied Structural Steel* involved a private contractual relationship, while *United States Trust Co.* dealt with a state's obligation to bondholders in connection with an interstate compact. There is nothing in those decisions which suggests the applicability of the Contracts Clause to a state's regulation of the conditions of state employment.

## 2. *Due Process*

Plaintiffs argue that they have a legitimate expectation of continued employment in their positions and that under the Due Process Clause they were entitled to notice and individual hearings before they could be discharged. They base this argument upon the decisions in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

While it is true that those decisions hold that public employees having certain legitimate expectations of continued employment may not be dismissed summarily, they do not require that plaintiffs in this case be afforded notice and hearing. The crucial distinction is that here we are dealing with an act of a state legislature of general application to all employees within the specified classifications, not with the dismissal of an individual public employee. If the legislative classifications set up by the Act are not reasonable, then they are subject to attack under the Equal Protection Clause. Plaintiffs admit to being in violation of the Act as written. Thus, to require an individualized hearing before dismissal would add nothing. Conversely, if the Act is a constitutional exercise of legislative power, then it is ludicrous to suggest that hearings must be held to confirm a decision that the legislature has already validly made. What plaintiffs really seem to be arguing here is that the legislative classifications made by the Act are overinclusive, because the Act will result in the dismissal of many persons who need not be discharged in order to accomplish the purposes of the Act. This is a classic equal protection argument, which we address next.

## 3. *Equal Protection*

Plaintiffs' most serious challenge to the constitutionality of the Act is based upon the Equal Protection Clause of the Fourteenth Amendment. Specifically, plaintiffs challenge the classifications made by subsections A and E of La.R.S. 42:63.

Subsection A prohibits any person who is employed (whether in a full-time or part-time job) by the federal government, another state government, or a foreign government, from holding employment with the state of Louisiana or any of its political subdivisions.

Subsection E prohibits the holding of two full-time jobs [7] with the state of Louisiana or any of its political subdivisions.

Plaintiffs do not challenge the portions of these subsections which apply to government officials, as opposed to government employees. In memoranda, plaintiffs assert a challenge to subsection B of Section 63. However, none of the plaintiffs fit the clas-

---

7. "Full-time" is defined in La.R.S. 42:62(4):

(4) "Full time" means the period of time which a person normally works or is expected to work in an appointive office or employ- ment and which is at least seven hours per day of work and at least thirty-five hours per week of work.

sification made by that subsection. Nor do any of the named plaintiffs fit that portion of subsection E which prohibits the holding of two state full-time jobs as opposed to one state and one "local" job. The state may have some different, if not greater, interest in prohibiting the holding of two jobs by one employee where the state is the direct employer in both. However, subsection B and the state-state portion of subsection E are not before the court.

*Standard of Review*

Traditionally, equal protection analysis was a "two-tiered" approach. When a legislative enactment involved a "fundamental right" or a "suspect classification", the statute would be subject to strict scrutiny, requiring that the Act further a compelling state interest. *See, e. g., Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (right to vote); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed. 222 (1964) (race). In the absence of such factors the Act would be subject to "minimum scrutiny", requiring only *some* rational basis for the legislative classification. Under this test, the states were given a wide scope of discretion. *Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920); *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

In the last decade, a new intermediate test has been used in equal protection analysis. *See* Gunther, *The Supreme Court, 1971 Term-Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv.L.Rev. 1 (1972).

This intermediate standard has been stated as a requirement that the legislative classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190 at 197, 97 S.Ct. 451 at 457, 50 L.Ed.2d 397 (1976).

Thus, under this test, the first task is to examine the interests of the state in enacting the legislation. Then, the state's ends must be tested to determine whether they are substantially related to the legislative classification made by the statute. The closeness of the fit required between means and ends depends upon the relative importance of the interests of the plaintiff and of the state. *See Morial v. Judiciary Commission of the State of Louisiana*, 565 F.2d 295 (5th Cir. 1977). *Morial* involved First Amendment considerations in addition to those involving public employment. Plaintiffs' interests adversely affected by the Act, although not related to First Amendment concerns, are important enough that the Act should be subject to intermediate scrutiny. The right to hold public employment has been given substantial weight in Fourteenth Amendment decisions. *See, e. g., Roth v. Board of Regents* and *Perry v. Sinderman, supra*. This right is certainly as important as the right to municipal water service, which was held sufficient to invoke intermediate scrutiny in a recent decision by the Fifth Circuit, *Chatham v. Jackson*, 613 F.2d 73 at 80 (5th Cir. 1980).

*The Competing Interests*

The state puts forth a number of justifications for the Act's prohibitions: First, the Act is intended "to promote and maintain in the general citizenry a high level of confidence and trust in public officials, public employees, and governmental decisions." [8]

---

8. Section 61 states its explicit purposes:

§ 61. Declaration of policy

A. It is essential to the maintenance of a democratic society that public officials and employees perform the public business in a manner which serves to promote and maintain in the general citizenry a high level of confidence and trust in public officials, public employees, and governmental decisions. The attainment of this end is impaired when a public official or employee holds two or more public offices or public jobs which by their particular nature conflict with the duties and interests of each other. The attainment of a high level of confidence and trust by the general citizenry in public officials, employees, and governmental decisions is further impaired by the excessive accumulation of governmental power which may result from public officials or employees holding two or more public offices or public jobs.

The Act is also said to be aimed at maintaining an efficient public work force, on the theory that a person holding two full-time jobs could not be performing both with maximum efficiency. Third, the Act seeks to spread public employment among as many persons as possible. And finally, especially with regard to the prohibitions in subsection A, the Act is designed to avoid divided loyalties.

The plaintiffs' interests, against which the state's must be balanced, have already been mentioned: plaintiffs seek to retain their public jobs in order to support their families; to "make ends meet" in these times of raging inflation and scarcity of available jobs. These interests are made more significant by the relative increase in public employment as compared to private during the past several decades.

*Analysis*

■ We first address plaintiffs' argument that the Act is unconstitutional because it is underinclusive. Plaintiffs point out the numerous exceptions to the Act which are listed in Section 66. They argue that the Act's allowance of so many dual offices, some involving substantial powers or potential conflicts of interest, deprives the named plaintiffs of equal treatment under the law. The court is not persuaded by this argument.

It is true that many of these exceptions cannot be readily explained in light of the Act's avowed purposes. However, legislative decisionmaking necessarily involves compromise. To hold the Act unconstitutional simply because it has too many exceptions would be to require that a statute either go all the way in remedying a perceived problem, or not attack the problem at all. Such an approach involves too great a judicial intrusion upon the legislative function. Of course, if the exceptions are so numerous and so comprehensive that they cast serious doubt upon the sincerity of one or more of the state's avowed objectives in passing the Act, then the court should reject the purported objectives as not consistent with the Act as written. Such is not the case here. These exceptions are not by classes of persons; they are applicable to certain specified positions, presumably based upon special circumstances within the knowledge of the legislature. The exceptions in Section 66 do not distinguish between broad categories of jobs as do the classifications made by Section 63 discussed below.

Turning to plaintiffs' argument that the Act is overinclusive, we first treat that argument with respect to the challenge of subsection A of Section 63.

■ This provision is so overbroad with respect to any legitimate state objective that it is irrational and hence unconstitutional.

The state's first stated objective, the promotion of public confidence, is really more pertinent to positions of more power or influence than those which plaintiffs hold. This objective is reflected in the Act's "Declaration of policy" (La.R.S. 42:61) which speaks of avoiding conflicts of interest and "excessive accumulation of governmental power". The state argues, however, that the promotion of public confidence is also achieved by avoiding even the appearance of impropriety, and that the circumstances of plaintiffs' dual positions may sometimes involve an appearance of impropriety. The state cites as an example, that some of the plaintiffs finish their day-time job at 5:00 p.m. and begin their second job, at a different location, at the same time. This circumstance, they argue, may raise public suspicion that plaintiffs and others similarly employed are not really working the required hours, and that the public payroll is being abused. The plaintiffs explained this apparent discrepancy. They testified that they are given a 15-minute grace period at

---

B. It is the purpose of this Part to implement a policy which will serve to maintain a high level of trust and confidence by the general citizenry in public officials, employees, and governmental decisions of the government of this state and of its political subdivisions by defining and regulating dual employment and by defining, regulating, and prohibiting dual officeholding.

the start of their second job, which time is then deducted from their half-hour meal break.

In any event, subsection A does not bear any reasonable relation to this purported objective. This subsection prohibits a person who holds a job with the state or a political subdivision from holding *any* job with any other government, federal, foreign, or of other states. Subsection A applies to part-time or full-time jobs. It says nothing about whether the days or times of such employments conflict. It would preclude, for example, a week-end only, one day a week job for a public employee whose regular job was on weekdays only. It stretches the imagination to argue that such a situation is destructive of public confidence in government. In actuality, a state's attempt to prevent its employees from earning a decent livelihood by holding a second, non-conflicting job, is actually destructive of the commodity it seeks to preserve, public confidence in government.

The second asserted objective, maintaining an efficient work force, does not justify the breadth of subsection A either. This subsection does not apply only to two full-time jobs. Nor does it explain why all "second" jobs (full-time or part-time) with other governments are prohibited, but not any private employment regardless of its extent. Perhaps the legislature considered it beyond its power to prohibit its employees from working after hours for private industry. It is equally impermissible for the State of Louisiana to tell an employee that he cannot work for the U.S. Postal Service or the City of Pass Christian, Mississippi, on his time off.

The third justification put forth by the state is the spreading of public jobs. Presumably, the desired result is that public jobs are distributed to those who need them, not to those already having one job. While this is certainly a legitimate state objective, the means employed in the Act are not substantially related to that end. In particular, this justification does not ex-

plain why a second public job with the federal government, for example, is treated differently than a second job in private industry. As noted before, we are not dealing here with a situation where the state itself is the direct employer in two positions. None of the named plaintiffs fit such a classification.[9] In such a case, the state may perhaps legitimately enact a "one-to-a-customer" rule. However, this reasoning does not apply when the state is not the source of both jobs. It is when the state seeks to regulate non-state employment, and then makes a distinction between such employment for another government and a job with a private employer, that the reasonableness of the classification breaks down. What legitimate state interest is served by taking away these plaintiffs' custodial jobs and making the positions available to persons who may hold a full-time private job? The result of the Act is that persons similarly situated with respect to the interests of the state are treated differently, irrationally.

Finally, as to the fourth purported objective, preventing divided loyalties, this interest is hardly applicable to those such as plaintiffs, who hold only low-level jobs. For example, divided loyalty could not be considered a serious problem for a person who is a custodian for the City of New Orleans and a letter carrier for the U.S. Post Office.

■ Most of what has been said above with respect to the legitimacy of subsection A applies to subsection E as well. However, the state's interest in this subsection may be entitled to some greater weight. First, subsection E only applies to two full-time positions. Thus, it represents a closer fit with the asserted justification of maintaining employee efficiency. Also, the state may have a more legitimate interest in prohibiting dual employment in its political subdivisions, than it has in penalizing those who hold jobs outside of the state's system entirely, i. e., with the federal government, a foreign country or another state.

---

**9.** Thus, we do not discuss the constitutionality of subsection B of Section 63, nor that portion of subsection E which applies to two *state* employments.

While these additional considerations make the issue of the constitutionality of subsection E somewhat more difficult, we conclude that they do not provide sufficient justification for the classifications in subsection E. Simply stated, we find employment by a political subdivision of the state to be more closely akin to employment in private industry than to direct employment by the state itself. While it may be argued that all jobs in the political subdivisions of a state come under the general umbrella of state employment, it can hardly be argued that employment by a political subdivision is subject to the same plenary control by the legislature as is employment directly by the state. There are a number of considerations involving the financing, structure, and political autonomy of local governments which justify more careful scrutiny of state intrusion into these areas than with respect to state regulation of its own direct employees. The state's avowed purposes in passing the Act do not bear a substantial relation to the distinction in subsection E between persons who hold two full-time positions, one of which is with a political subdivision of the state, and persons who hold full-time private employment along with their state jobs.[10]

Defendants and amicus curiae have argued that prohibitions of dual officeholding and employment are not new and can be found in the statutes of many other states.[11] However, our attention has been called to no other statute which is as far-reaching and comprehensive as the Act in question. None of the other state statutes cited go as far as the Act in question in prohibiting dual employment, as opposed to dual officeholding.

Our holding that the Act is unconstitutional is supported by other decisions involving public employment.

In *Thompson v. Gallagher*, 489 F.2d 443 (5th Cir. 1973), the court invalidated a city ordinance which prohibited employment of veterans who did not have an honorable discharge. The court held that although Thompson did not have a constitutional right to be a public employee, he did have "the right to be free from arbitrary and unreasonable government action;" "a classification which serves no rational purpose or which arbitrarily divides citizens into different classes and treats them differently violates the equal protection clause." 489 F.2d at 447.[12]

The Act in this case does have some rational underlying purpose. However, the various distinctions made by the subsections of the Act under attack, e. g., between outside employment with a government entity and with a private company, are lacking in rationality. In other words, while the Act has legitimate objectives, the various categories of prohibited outside employment specified by the legislature are not "substantially related to achievement of those [legitimate] objectives." *Craig v. Boren, supra.*

In *Coakley v. Postmaster of Boston, Mass.*, 374 F.2d 209 (1st Cir. 1967), the court struck down a postal regulation which prohibited postal employees from holding full-time employment with a state or local government, but not with private industry. The court held that the distinction between outside public and outside private employment had no rational basis. The *Coakley* decision, although not binding on this court, is certainly persuasive.

As the court did in *Coakley*, 374 F.2d at 211, we stress that we are not dealing with a law forbidding all "moonlighting." Such

10. Defendants have cited a federal statute, 5 U.S.C. § 5533, as an example of a permissible prohibition on dual employment. We note, however, that this statute is a prohibition on holding two positions with the federal government. It is thus analogous to the Act's prohibition of two state, as opposed to local, jobs in subsection B and portions of subsection E, which provisions are not before the court.

11. Under the common law, there were restrictions on the holding of incompatible offices. *See Annotation*, 63 Am.Jur.2d, *Public Officers and Employees*, §§ 61–81.

12. Although the court in *Thompson* articulated a standard of review similar to the "minimum scrutiny" test, the court's analysis and the decision it reached reflect a stricter standard.

a statute may well pass constitutional muster. But when a statute makes certain distinctions, the distinctions must be rational or they will violate equal protection. *Thompson v. Gallagher, supra.*

The distinctions made by the Act, as to what outside employment will be tolerated, are as irrational as the distinctions struck down in *Gosney v. Sonora Independent School Dist.*, 603 F.2d 522 (5th Cir. 1979). *Gosney* dealt not with statutory classifications, but with the discriminatory application of a facially valid statute. More deference may be due to a legislative act than to the enforcement functions carried out by the school board in *Gosney.* However, the effect of the statutory classifications in this case and the school board's selective enforcement in *Gosney* is the same: an irrational prohibition as to certain outside employment while other such employment is permitted.

It is true that a court should not substitute its judgment for the judgment of the legislature and strike down a law merely because it seems unfair, unwise, or because a more just system could clearly be devised. *See, e. g., Puglisi v. United States*, 564 F.2d 403 (Ct.Cl.1977). *Puglisi* involved a challenge to a Congressional Act, the Dual Compensation Act of 1964, which withheld retirement pay from retired regular military officers who held civilian jobs with the federal government, but exempted retired reserve officers who held civilian positions, allowing the latter group to receive their full retirement pay. The Court of Claims upheld the distinction made by the Act, but only upon a specific finding that there were significant differences between retired regular officers and retired reserve officers which justified the statutory differences in treatment between the two groups. 564 F.2d at 409–410.

In the instant case, defendants have not suggested any significant reason for the various "moonlighting" categories established by the Act, some permitted, some prohibited.

The court in *Puglisi* also noted that the Congressional history demonstrated that Congress, fully aware of the distinction made by the act between regular and reserve retired officers, and for reasons stated during consideration of the statute, declined suggestions from various federal agencies that the distinction be eliminated. In contrast, in the instant case there is no indication that the Louisiana legislature made such a determination; the distinctions made by the Act simply do not relate to the Act's avowed objectives.

Of course, many state statutes restricting dual officeholding have been upheld. Invariably, however, these provisions were more narrowly and carefully drawn than the Louisiana statute involved here.[13]

### 4. Louisiana Constitution

Finally, plaintiffs assert a pendent claim based upon Louisiana Constitution, Article 10, § 22, which provides:

> § 22. Dual Employment and Dual Officeholding
>
> Section 22. The legislature shall enact laws defining and regulating dual employment and defining, regulating, and prohibiting dual officeholding in state and local government.

Plaintiffs argue that the history of the enactment of this provision by the Louisiana Constitutional Convention shows that the framers intended that the definition of dual employment, as opposed to dual officeholding, be narrowly drawn. But however narrowly the delegates to the convention would have drafted the statute, it is clear that in the enactment of Section 22 they left a great deal of discretion to the state legislature. We do not read this section of the Louisiana Constitution, a clear mandate to the legislature to enact a statute "defining and regulating dual employment", as prohibiting the legislature from passing this particular Act.

---

13. For a thorough review of state court decisions in this vein, and also a good discussion of the permissible breadth of such statutes, *see*

*Cummings v. Godin*, 377 A.2d 1071 (Sup.Ct.R. I.–1977).

It is true that the section's use of the word "prohibiting" with respect only to dual officeholding and not in relation to dual employment implies that employees must be treated less strictly than officials. This the Act does.

*Conclusion*

Judgment will be rendered declaring subsection A of La.R.S. 42:63 unconstitutional as applied to those holding employment (as opposed to those holding elective or appointive office) with the state government or a political subdivision thereof.

Judgment will also be rendered declaring subsection E of La.R.S. 42:63 unconstitutional as applied to those holding full-time employment (as opposed to those holding a full-time appointive office) with the State of Louisiana and full-time employment with a political subdivision thereof; and as applied to those holding two full-time employments with a political subdivision of the state.

Further, a permanent injunction enjoining the enforcement of the provisions declared unconstitutional will be issued.[14]

## SUPPLEMENTAL REASONS FOR JUDGMENT

As noted in the court's earlier reasons, two issues remain for determination.

### 1. *Attorney Fees*

■ This case was brought under 42 U.S.C. § 1983. Under 42 U.S.C. § 1988, plaintiffs, as prevailing parties, may be awarded attorney fees as part of the costs. It is well settled that under § 1988, attorney fees should be awarded to a prevailing plaintiff unless there are special circumstances that would render such an award unjust. *Iranian Students Ass'n v. Edwards*, 604 F.2d 352 at 353 (5th Cir. 1979) and cases cited therein.

Finding no special circumstances in this case, the court hereby orders that attorney fees be awarded. If the parties are unable to agree before that date on the amount of fees due, a hearing on that issue will be held on July 16, 1980.

### 2. *Class Certification*

Counsel for the parties conferred at the court's request informally on June 12, 1980. It was agreed that the informal conference would constitute a hearing on the issue of class certification and that no further hearing would be required.

■ In a case such as this one, where a state statute has been declared unconstitutional and the enforcement of the statute has been enjoined, there is little practical difference between a judgment in favor of individual defendants and a judgment in favor of a proposed class they seek to represent. At conference, the attorney for the State of Louisiana assured the court that the provisions of the act found unconstitutional will not be enforced pending appeal, and that the Attorney General would advise local officials not to enforce the provisions at issue pending a final determination of their constitutionality on appeal. Thus, the State argues that it is unnecessary and indeed would serve no useful purpose to certify a class. However, plaintiffs point out that theoretically the Court's judgment runs only in favor of the named plaintiffs. There are also problems that possibly could arise in the future as to mootness or standing if a class is not certified.

There is no dispute that the case meets all of the prerequisites of Rule 23(a), Fed.R. Civ.P., and fits the type of class defined in Rule 23(b)(2). Further, no significant expenditure of judicial resources is required to certify a class in this case. The Court will, therefore, certify a class with the named plaintiffs as class representatives.

In their complaint, plaintiffs have suggested the following class:

All persons in the State of Louisiana who hold two or more public jobs which by their particular nature do not conflict with the duties or interest of each other or result in the excessive accumulation of governmental power, and who stand to lose rights as a

---

**14.** The Act has a "severability" provision, Section Seven.

result of the enforcement of a portion of Act 700 of 1979, specifically La.R.S. 63(A)(B) and (E).

The Court finds, however, that this proposed class is overbroad as to the issues in this case and therefore certifies the following class instead:

All persons holding employment in any of the branches of government of the State of Louisiana or of a political subdivision thereof and who also hold employment in the government of a foreign country, in the government of the United States, or in the government of another state; and all persons holding full-time employment with the State of Louisiana who also hold full-time employment with a political subdivision thereof.