Lawrence CABAIS, et al.

v.

Roscoe EGGER, Commissioner of the Internal Revenue Service, et al.

Nos. 81–2258 to 81–2260 and 81–2264.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 4, 1982.

Decided Sept. 23, 1982.

As Amended March 21, 1983.

---

Wendy L. Kahn, Washington, D. C., with whom John Fillion, Jordan Rossen, Detroit, Mich., and Jonathan A. Weiss, New York City, were on joint brief for Intern. Union, et al., appellees in Nos. 81–2258 and 81–2260 and cross-appellants in Nos. 81–2259 and 81–2264.

Robert M. Raives, New York City, entered an appearance for Nat. Retired Teachers Ass'n, et al., appellants in No. 81–2259 and cross-appellees in No. 81–2260.

Before ROBINSON, Chief Judge, SWYGERT,[*] Senior Circuit Judge, and WALD, Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SWYGERT.

SWYGERT, Senior Circuit Judge.

These consolidated appeals involve the pension offset provision of the Federal Unemployment Tax Act ("the Federal Act" or "FUTA"), 26 U.S.C. §§ 3301 *et seq.* The plaintiffs, Lawrence Cabais, *et al.*, are individuals who allege injury resulting from the pension offset provisions. The plaintiffs, International Union, United Automobile Aerospace and Agricultural Implement Workers of America, UAW, *et al.*, are unions and associations representing in these cases retired persons whose memberships are allegedly injured by the same offset provision. (The plaintiffs will be referred to collectively as "Cabais.")

Some background information is essential to an understanding of the issues presented in these appeals. Unemployment insurance in this nation is a joint federal-state responsibility. Under the Federal Act, employers must pay federal unemployment taxes on wages paid while each state provides unemployment compensation to claimants in accordance with state law. If the laws of a state comply with minimum federal standards established under the Federal Act, employers in that state are allowed a ninety percent credit against FUTA tax liability. In addition, the states themselves receive federal grants to cover the necessary costs of administering the state program if the

Stanley S. Harris, U. S. Atty., Michael Kimmel and Leonard Schaitman, Attys., Dept. of Justice, Washington, D. C., were on the brief for appellants in Nos. 81–2258, 81–2260 and cross-appellees in Nos. 81–2259 and 82–2264.

[*] Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1970).

program meets the requirements of section 303 of the Social Security Act, 42 U.S.C. § 503(a), as well as the standards under the Federal Act. Each year the Secretary of Labor examines the laws of each state and certifies those states which comply with the minimum federal standards.[1] The Department of Labor informs state agencies of the minimum federal requirements they must meet to remain certified primarily by issuing Unemployment Insurance Program Letters. In determining whether a state's unemployment compensation system is in compliance with federal standards, the Secretary of Labor relies on the positions he has taken in the letters. A state which is not in compliance can be decertified but the Secretary must provide the state with a hearing.

In 1976, Congress enacted section 3304(a)(15) of the Federal Unemployment Tax Act to require that all states offset work-related pension income from unemployment benefits after September 30, 1979. The effective date of this section was delayed by amendment until April 1, 1980. It appeared that section 3304(a)(15) might be repealed or further amended prior to its April 1, 1980 effective date but, in fact, no amendment was passed until September 26, 1980.

In March 1980 the Department of Labor issued Unemployment Insurance Program Letter 24-80. The subject matter of the letter was the 1976 amendments to the Federal Act and the letter reminded states of the April 1, 1980 effective date. On April 16, 1980 the Secretary of Labor wrote to the governors of several states and informed the governors that their respective states had not passed legislation which conformed with the 1976 amendments and "recommended" that the states pass such legislation retroactive to April 1, 1980. In October 1980 Unemployment Insurance Program Letter 7-81 was issued. The subject matter of this letter was the September 1980 amendments to the pension offset provisions of the Federal Act.

The plaintiffs challenged the reductions called for by section 3304(a)(15) on three alternative grounds:

(1) the amendments to the Federal Act violated the United States Constitution;

(2) the position of the Department of Labor as set out in the letters was inconsistent with the statute; and

(3) the letters 24-80 and 7-81, and the letter of April 16, 1980 were procedurally invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

The district court rejected plaintiffs' constitutional claim on the merits, dismissed the statutory claim, and ruled that the letters and the letter of April 16, 1980 were substantive rules subject to the notice and comment provisions of the APA and the publication provisions of FOIA.

The defendants in this case, Roscoe Egger, the Commissioner of Internal Revenue, and Raymond Donovan, the Secretary of Labor (referred to collectively as "Secretary"), appeal from the judgment of the district court on two grounds:

(1) the rules contained in the letters and the April 16, 1980 letter are interpretative rules and are not subject to the requirements of the APA or FOIA; and

(2) the states are indispensable parties under Rule 19 of the Federal Rules of Civil Procedure and should have been joined as parties.

On cross-appeal the plaintiffs raise the issues of statutory interpretation dismissed by the district court. As cross-appellees, the Secretary asserts that the issues of statutory construction are not ripe for review.

We conclude that, with one exception, the action undertaken by the Department of Labor in the letters and the April 16, 1980 letter constitutes interpretative rules exempt from APA procedures. Further, we do not reach the issues of statutory interpretation because they are not ripe for review.

---

1. All fifty states and the District of Columbia are currently certified participants in the program.

## I

■ Before beginning our analysis of whether the rules involved in this appeal are interpretative or substantive, there is a need to clarify the applicable law. The district court concluded that the letters and the April 16, 1980 letter are subject to the notice and comment provisions of the APA solely because they have a "substantial impact" on recipients of unemployment insurance. (Memorandum Opinion, Aug. 27, 1981 at p. 9.) This court erred in using the substantial impact test. At one time, the test was used to determine the applicability of APA procedures by asking essentially whether the agency action had an impact on the rights and interests of private parties. *See, e.g., Lewis-Mota v. Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972); *Texaco, Inc. v. FPC,* 412 F.2d 740 (3d Cir. 1969); *National Motor Freight Traffic Ass'n v. United States,* 268 F.Supp. 90 (D.D.C.1967) (three-judge court), *aff'd per curiam,* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). Since *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460, it is clear that a court cannot engraft additional procedures on agency action beyond those contemplated by the APA (or another specific Act).[2] Simply because agency action has substantial impact does not mean it is subject to notice and comment if it is otherwise expressly exempt under the APA.[3] In other words, as an independent basis for determining the applicability of APA procedures, the substantial impact test has no validity. Nonetheless, there is no "reason to doubt the continued vitality of the substantial impact test as . . . one of several criteria for evaluating claims of exemption from [the APA]." *Batterton v. Marshall,* 648 F.2d 694, 709 n.83 (D.C.Cir.1980).

There are four basic exemptions to the notice and comment requirements of the APA:

(1) interpretative rules;

(2) general statements of policy;

(3) rules of agency organization, procedures or practice; and

(4) the "good cause" exception.

5 U.S.C. § 553(b)(3)(A) & (B). Although the substantial impact test may be useful in determining whether agency action is a general statement of policy (*see, e.g., Pickus v. Board of Parole,* 507 F.2d 1107, 1112 (D.C.Cir.1974)), or whether agency action is exempt for good cause, this circuit has declined to use the test for distinguishing between substantive and interpretative rules.[4] In *British Caledonian Airways, Ltd. v. CAB,* 584 F.2d 982 (D.C.Cir.1978), this court stated that "[m]erely because a rule has a wide ranging effect does not mean that it is 'legislative' rather than interpretative."[5] Interpretative and substantive rules may both vitally affect private interests,[6] thus, the substantial impact test has

---

**2.** A court may require additional procedures if constitutional constraints or extremely compelling circumstances are present. *Vermont Yankee, supra,* 435 U.S. at 543, 98 S.Ct. at 1211. These circumstances are not present here.

**3.** The words "substantial impact" do not appear in the APA, 5 U.S.C. § 553. The substantial impact test has been criticized as being an "unwarranted judicial gloss." *Energy Reserves Group, Inc. v. Department of Energy,* 589 F.2d 1082, 1094 (Em.App.1978).

**4.** Another possible application of the "substantial impact test" is to determine whether agency action should be invalidated where the action did not comport with APA procedures. This use of the test is similar to the concept of harmless error. Even where notice and comment were erroneously omitted, a regulation or rule need not be invalidated if it has no substantial impact. *See National Helium Corp. v. FEA,* 569 F.2d 1137, 1146 (Em.App.1977).

**5.** At least one other circuit has reached the opposite conclusion. "To determine whether the amendment was substantive or interpretative, we must focus upon its impact on the [affected parties]." *American Bancorp., Inc. v. Board of Gov. of Fed. R. Sys.,* 509 F.2d 29, 33 (8th Cir. 1974).

**6.** A failure to require rulemaking procedures for interpretative rules with substantial impact may not seem fair but strict adherence to the letter of the APA without reference to "elementary fairness" (*see Independent Broker-Dealers Trade Ass'n v. SEC,* 442 F.2d 132, 144 (D.C. Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971)), is not as harsh as it seems. Affected parties may seek redress in the courts

no utility in distinguishing between the two. The proper test for resolving the substantive-interpretative dichotomy is found in *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952):

> Generally speaking, it seems to be established that "regulations," "substantive rules" or "legislative rules" are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means.

Using this test,[7] it is our conclusion that the rules enunciated in the letters and the letter of April 16, 1980 are, with one exception, interpretative rules exempt from the rulemaking procedures of the APA.[8]

*Unemployment Insurance Program Letter 7–81 (and Change I)*

■ All but one of the directives are interpretative rules. For the most part, the letter simply construes the language and intent of 26 U.S.C. § 3304(a)(15) and "reminds" the states of "existing duties." *Citizens to Save Spencer County v. U.S. Environmental Protection Agency,* 600 F.2d 844, 876 n.153 (D.C.Cir.1979). It does not grant or deny rights and it does not impose obligations which do not already exist in the statute (with one exception). A side-by-side comparison of the letter and section 3304 shows that the letter either restates or clarifies specific sections or clauses of the statute.

Cabais's arguments that letter 7–81 contains substantive rules revolves substantially around the "impact" of the letter on affected parties.[9] As we stated, *supra,* the impact of agency action is not helpful in determining whether this action is interpretative or substantive. Cabais also argues that these rules (letters) must be substantive because they contradict the statute. This, however, is also not instructive in determining whether or not a rule is interpretative. A statement which is interpretative does not become substantive simply because it arguably contradicts the statute it interprets. Cabais's argument wrongly assumes that there can never be an "erroneous" interpretative rule.[10] Irrespective of

and courts are not strictly bound by an agency's interpretative rules.

7. Before applying the *Gibson* test to the agency action involved in this appeal, we note that the Department of Labor characterizes its own actions as "interpretative" rules. While not conclusive, this characterization "is entitled to a significant degree of credence." *British Caledonian Airways, Ltd. v. CAB,* 584 F.2d 982, 992 (D.C.Cir.1978).

8. Despite our conclusion that all but one of the rules are exempt from APA procedures, we indicated by order immediately after oral argument that publication under the Freedom of Information Act, 5 U.S.C. § 552(a)(1)(D), was appropriate. We believe the letters are "interpretations of general applicability formulated and adopted by the agency." *Id.* The letters have since been published in the Federal Register. With the one exception detailed, *infra,* the Secretary may commence enforcement proceedings under 26 U.S.C. § 3304(c) where appropriate.

9. Cabais also relies heavily on language in *Batterton v. Marshall, supra,* 648 F.2d at 694, in arguing that the letters at issue here are substantive rules. The court in *Batterton* said that a rule may be interpretative if it does not foreclose alternate courses of action or conclusively affect the rights of private parties. *Id.* at 702. Cabais misinterprets the intent of this language. A rule may be substantive if it forecloses alternate courses of action or has an effect *completely independent* of the statute. If this is the case, the rule is creating new law. Here, the options open to the states are limited but this is a result of the statute, not the Secretary's interpretation.

The *Batterton* court also said that rulemaking exemptions should be recognized only where agency action does not in fact bind the agency or the court. *Id.* at 704.

In the instant case, neither the agency nor this court is bound by the letters. The Secretary could change its interpretation simply by issuing another letter and we could set aside an interpretation contained in any letter if, for example, we found it to be arbitrary. *See* 5 U.S.C. § 706(2)(A).

10. As an example of a rule which he believes is substantive because it contradicts the statute, Cabais points out that letter 24–80 requires proration on a weekly basis of pensions received on a monthly basis. This requirement is the Secretary's interpretation of 26 U.S.C. § 3304(a)(15) which requires offset of certain pensions which are "reasonably attributable to such week." Clearly the Secretary's position is a rational interpretation of this language. For

whether letters should be found to contradict 26 U.S.C. § 3304(a)(15), they contain only interpretative rules with one exception.

■ The exception—the one substantive provision—is found in letter 7–81 Change I, section 5. Section 5 establishes rules relating to 26 U.S.C. § 3304(a)(15)(B) which provides:

the State law may provide for limitations on the amount of any such a reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment.

This subsection is very broad and Congress obviously intended to permit the states wide latitude for its implementation. Nevertheless, section 5 of Unemployment Insurance Program Letter 7–81 Change I establishes detailed rules with mathematical formulae for determining individual contributions to pension funds. These rules limit state discretion in this area and impose an obligation on the states not found in the statute itself. It cannot reasonably be argued that these rules are merely interpretative. These particular rules are subject to the procedures of the APA and the Secretary can be enjoined from using them in assessing the appropriateness of certifying a state under the Federal Act.

*Unemployment Insurance Program Letter 24–80*

■ We believe letter 24–80 contains only interpretative rules. Much of letter 24–80 has been superseded by the 1980 amendments to the Federal Act and letter 7–81. The only sections which remain applicable are those dealing with: (1) the distinction between primary benefits and survivor benefits and between pension benefits

generally and non-pension benefits (24–80 sec. 4 after "First ..."); (2) state options regarding lump sum retirement payments (24–80 sec. 4 after "Second ..."); (3) retroactive payment of pensions for weeks in which unemployment benefits have already been paid (24–80 sec. 4 after "Third ..."); and (4) a reference to a telegram which discusses the proration of periodic pension payments into weekly amounts. The arguments above which apply to all but section 5 of 7–81 Change I also apply to 24–80. Letter 24–80 was intended primarily to inform states about the 1976 amendments to the Federal Act and to clarify and communicate the Secretary's interpretation of the amendment. As Judge MacKinnon stated in *British Caledonian Airways, Ltd. v. CAB*, 584 F.2d 982, 990 (D.C.Cir.1978), "[a]ll one needs do is examine the regulatory and statutory scheme under which the [rules] here in question [were] issued in order to perceive that [they are] plainly interpretative and explanatory rather than legislative." The 1976 and 1980 amendments to the Federal Act and letter 7–81 (with 7–81 Change I) and letter 24–80 are included in the appendix to this opinion for this very reason.

*April 16, 1980 Letter*

There is no need for us to discuss the letter of April 16, 1980. Its provisions have been superseded by the 1980 Federal Act amendments and letter 7–81. Whether it contained interpretative or substantive rules is now moot.

## II

■ The Secretary argues that the questions of statutory interpretation should not be considered because they are not ripe for review.[11] We agree. In *Abbott Laborato-*

---

example, it is rational to attribute one-quarter of a monthly pension check to each week in February. Whether or not this is ultimately an erroneous interpretation does not make it any less an interpretation.

**11.** Cabais contends that we should not consider the Secretary's ripeness argument because it was not timely raised. Relying on *Bituminous Coal Operators Ass'n v. Secretary of Interior,*

547 F.2d 240, 244 (4th Cir. 1977), Cabais argues that ripeness is a question of justiciability not jurisdiction. Although the court in *Bituminous Coal, supra,* did find the ripeness issue to be untimely, the court, interestingly enough, reached the merits of the issue. We proposed to do the same.

Further, the doctrine of ripeness, in the context of this appeal, has both elements of justiciability and jurisdiction. Insofar as the Secre-

*ries v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court held that when determining ripeness for review, we must consider whether an issue is fit for judicial decision and whether there is any "hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. In order to find "hardship," the "impact of the [agency action] upon the [plaintiffs must be] sufficiently direct and immediate as to render the issue appropriate for judicial review." *Id.* at 152, 87 S.Ct. at 1517. In the instant case, the impact of the agency action on Cabais is not direct. As we stated above, unemployment insurance is a joint state-federal program. The federal government establishes minimum standards which state laws must comply with, but the states have considerable flexibility to adopt their own rules. The laws of a particular state might be consistent with the Secretary's interpretation of section 3304(a)(15) as outlined in the letters and yet have a greater or lesser impact upon recipients depending on whether a state chooses to exceed federal minimum standards or ignore the Secretary's interpretation of the Federal Act. Assuming that we were to invalidate the letters as being inconsistent with the statute, other court actions would be necessary to determine whether particular state laws were also invalid.[12] From this it can be seen that the agency action involved in this appeal only has an indirect effect on the plaintiffs; it is the state law

which directly has an impact upon unemployment insurance recipients.

A comparison with the facts of *Abbott Laboratories, supra,* reinforces our conclusion that the impact of the letter is not sufficiently direct. In *Abbott Laboratories,* the petitioners were faced with a dilemma: comply with agency action or risk substantial penalties. As Cabais points out, the states in the instant case are faced with a similar dilemma. No state, however, is a party in this action. The impact of the letters may be direct enough for a state to bring an action, but the plaintiffs in this case are one step removed and are not confronted by this dilemma.

Further, we are convinced that the plaintiffs will not suffer any hardship insofar as they have an "adequate remedy in court." 5 U.S.C. § 704. If a recipient's benefits are reduced pursuant to state law conforming to a federal interpretation, the recipient can challenge the state law and claim that it is inconsistent with FUTA as passed by Congress. If the challenge is successful, a court can award appropriate relief.

If a state chooses not to comply with the federal interpretation and a decertification proceeding were initiated, a claimant could seek to intervene. Failing intervention, he could await the termination of the decertification proceeding and then challenge whatever state law ensued.[13]

---

tary argues that the plaintiffs will not be harmed because there is another "adequate remedy in a court," (*see* text, *infra*) their argument is jurisdictional. Section 704 of the APA provides:

*Actions reviewable*
   Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

The elements of this section are jurisdictional prerequisites to judicial review, *Klein v. Commissioner of Patents of the U. S.,* 474 F.2d 821, 824 (4th Cir. 1973) and can, therefore, be raised at any time. *See also American General Insurance Co. v. FTC,* 359 F.Supp. 887 (S.D.Tex. 1973), *aff'd,* 496 F.2d 197 (5th Cir. 1974).

   There is another reason for us to consider the ripeness issue regardless of whether it is jurisdictional or justiciable in nature. The questions of statutory interpretation were not

reached by the district court and a remand would be necessary before we could consider them at all. Thus, it is in the interest of judicial economy for us to resolve the ripeness issue to determine whether remanding is necessary or appropriate.

**12.** Five states have "self-destruct" clauses which allow pension offset only if required by federal law. Although the impact of agency action is more direct in these states than any others, it is still state law which has an immediate impact on unemployment insurance recipients.

**13.** It is highly unlikely that a state would ever be decertified and if a state was decertified it is also implausible that it would remain so for very long.

Cabais insists that this approach is untenable because it will result in piecemeal litigation and the Secretary could not be joined as a party in a proceeding attacking state law. As we pointed out above (*see* text at footnote 12) piecemeal litigation might be necessary in any event and we do not believe that the Secretary must be a party to afford a plaintiff complete relief. In addition, challenging the state law has the added advantage of involving the states who have a substantial interest in this litigation.[14]

This cause of action is remanded to the district court with directions to modify its injunction consistent with this opinion.

*Reversed in part, affirmed in part, and remanded.*

## APPENDIX

26 U.S.C. § 3304(a)(15) (1976) reads:

(15) the amount of compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week;

Pub.L.94–566, § 314, 90 Stat. 2680 (1976).

26 U.S.C. § 3304(a)(15) (1980) provides:

(15) the amount of compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement

or retired pay, annuity, or other payment, which is reasonably attributable to such week except that—

(A) the requirements of this paragraph shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—

(i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law), and

(ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of prior law), services performed for such employer by the individual after the beginning of the base period (or remuneration for such services) affect eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment, and

(B) the State law may provide for limitations on the amount of any such a reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment;

As amended Sept. 26, 1980, Pub.L. 96–364, Title IV, § 414(a), 94 Stat. 1310.

### Text of UIPL 7–81

1. *Purpose.* To inform State agencies of the amendments made by P.L. 96–364 to the Federal Unemployment Tax Act, the Federal-State Extended Unemployment Compensation Act of 1970 (EUCA) and Title 5 U.S.C. 8521.

2. *References.* Sections 414, 415 and 416 of P.L. 96–364; Section 3304(a)(15), FUTA; Section 202, EUCA; 5 U.S.C. 8521(a)(1), and UIPL 24–80.

---

**14.** Despite the substantial interest of the states in this litigation, we do not believe they are indispensable parties under rule 19, Federal

Rules of Civil Procedure, because complete relief can be accorded among those who are already named parties.

3. *Background.* These amendments modify the pension deduction provision in section 3304(a)(15), FUTA, specify circumstances in which extended benefits are not payable on interstate claims, and increase the period of service necessary for former members of the Armed Forces to establish entitlement to unemployment compensation under Title 5 of the U.S.C.

4. *Amendment to Section 3304(a)(15), FUTA, the Pension Deduction Provision.* Section 414 of P.L. 96–364 amended section 3304(a)(15), FUTA, to require deduction of pension payments only in specified circumstances, and to allow States to consider an individual's contributions to the pension payment in determining the amount to be deducted. As so revised, the pension deduction standard now provides as follows:

"the amount of compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity or other payment, which is reasonably attributable to such week[;] *except that—*

*"(A) the requirements of this paragraph shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—*

*"(i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law), and*

*"(ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of prior law), services performed for such employer by the individual after the beginning of the base period (or remu-*

*neration for such services) affect eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment, and*

*"(B) the State law may provide for limitations on the amount of any such reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment;".* (New language italicized, deleted language bracketed.)

The amendments made by P.L. 96–364 to section 3304(a)(15) became effective on September 26, 1980.

Section 414(b) of P.L. 96–364 provides that the new pension deduction standard is applicable for certification of the States for 1981 and subsequent years. Therefore, States have the option to implement the new Federal deduction standard as of September 26, 1980. However, full conformity and compliance with the requirements of section 3304(a)(15), FUTA, as amended, is required for certification of State laws for the 12-month period beginning on November 1, 1980, and ending October 31, 1981. The requirements of section 3304(a)(15) prior to amendment by P.L. 96–364 remain effective through September 25, 1980. However, we do not recommend that these amendments be made retroactive except as is necessary where the State will have no pension deduction provision as of November 1, 1980, in which case the law should be made effective retroactively as of that date.

State laws which now provide for the deduction of pension payments in the circumstances prescribed by the Federal law prior to these amendments are not required to take further action in order to satisfy the requirements in the new amendments. However, we strongly recommend that States proceed now to take advantage of the less stringent condition under which pensions must be deducted from unemployment benefits pursuant to the Federal law requirement.

Section 3304(a)(15), FUTA as amended under P.L. 96–364, reflects only the minimum conditions under which deduction must be

required by State law for certification under FUTA. Although a State may broaden the scope of its deduction of pension payments beyond the conditions in which deduction is required under the Federal law, it may not adopt less stringent conditions which fall short of the Federal requirement. The requirement of the pension deduction standard in section 3304(a)(15), FUTA, as modified by the above cited amendments, is now applicable in less restrictive circumstances as noted above. The deduction is not only limited by the conditions contained in clauses (i) and (ii), but also gives States the option of limiting the deduction in unemployment benefits by taking into account an employee's contribution to the pension fund. As will be explained below, the limitations specified by these new clauses mean that the reduction in unemployment compensation by the amounts of pension payments received by an individual will be required under Federal law only if the pension is under a plan maintained or contributed to by a base period or chargeable employer and then, only if the services performed for such employer affect eligibility for, or increase the amount of, the retirement payment. However, as a result of the exception in clause (ii), eliminating application of its provisions to payments made under the Social Security Act or the Railroad Retirement Act of 1974, those particular payments are deductible in any case in which the individual's base period employer contributed to or maintained the pension plan under such Acts.

The limitation specifying that the deduction of a pension payment is required only if the pension is derived under a plan that a base period employer or chargeable employer contributed to or maintained is set forth in clause (i). Whether or not the employer is a chargeable or a base period employer is to be determined under the provisions of the State law. The employer need not be both a base period employer and also chargeable with any benefits payable under the State law. If it is either a base period *or* a chargeable employer that contributed to or maintained the plan, the pension received from the plan must be deducted.

Furthermore, the plan must be the same as that under which the individual has established his right to the pension payments. For example, if an individual at company A retires and collects a pension from A under a particular plan maintained by that employer, but then goes to work for company B who has an entirely different plan, and is subsequently laid off, the pension payment from company A would not be deductible (assuming that A is no longer a base period employer). Conversely, if an individual retires from company C to collect Social Security and then goes to work for company D where the individual is also covered under the Social Security Act, and thereafter the individual is terminated, the Social Security pension would then be deductible since company D (base period employer) contributed to the same plan as company C.

Clause (ii) also requires in addition that the "services performed for such employer by the individual after the beginning of the base period (or remuneration for such services)" must affect "eligibility for, or increase the amount of, such pension...." This means that if the services performed for the base period or chargeable employer did not affect either eligibility for or the amount of the pension received from the plan maintained or contributed to by a base period or chargeable employer, then the deduction is not required. The phrase "eligible for" pertains to the individual's capability of satisfying the conditions necessary to qualify for the pension. Thus, if the individual qualifies for a pension on the basis of the services performed for the base period or chargeable employer, or if the amount of the pension payment is increased by reason of such services, the pension payment would then be deductible.

The provisions of clause (ii) allowing States to disregard pension payments if the base period employment did not affect eligibility for or increase the amount of the pension, is not applicable, however, to Social Security and Railroad Retirement pensions received by an individual. Clause (ii) states specifically that the conditions contained therein

are applicable only "in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of prior law) . . . ." Consequently, only the provisions in clause (i) apply to Social Security and Railroad Retirement payments, which means that those payments are deductible whenever the individual's base period employer or the chargeable employer contributed to the plans provided under those Acts. It is not necessary that any contribution made on behalf of an individual under those plans or any services performed for such employers affect eligibility for or increase the amount of the individual's pension. Finally, under new section 3304(a)(15)(B), a State "may provide for limitations on the amount of any such deduction to take into account contributions made by the individual for the pension . . . ." Under this option a State may provide under its law for eliminating any part of the pension payment equivalent to the employee's share of the contributions to the pension fund, or it can provide for elimination of a representative percentage of the pension as determined under the State law. These are only examples of the types of limitations that can be applied under this option and are not intended to cover all of the possible alternatives that may be developed by the States. Although broad latitude is provided to the State in exercising this option, we believe any limitation adopted should be consistent with the basic purpose of the option which is to allow elimination of the individual's share of the contributions to the pension fund in determining the amount of pension to be deducted.

Determinations and review decisions on pension deduction issues should include specific findings on each of the elements involved. The kinds of findings will depend upon the provision adopted by the State. For example, when a Social Security pension is involved, there should be a finding on whether the individual is a primary beneficiary, because only primary insurance benefits are required by the Federal requirement to be deducted. If the provision is limited to pensions maintained or contributed to by a base period employer, the findings should specifically indicate whether a base period employer is involved. When an individual is receiving more than one pension, it should be specifically found whether both meet the deduction requirements. It is also required that determinations and appeal decisions particularly include the method by which a monthly pension is pro-rated to a weekly amount.

A number of states that amended their laws to meet the requirements of section 3304(a)(15) prior to its amendment by P.L. 96–364, also included provisos to render those provisions inoperative if they were not required to be included in the State law as a condition for full tax credit against the tax imposed by the FUTA. Those provisos were included in anticipation of the possible deletion of the Federal pension deduction standard. Since no deletion occurred, a question has arisen as to the impact of the Federal law changes on these provisos. Whether or not those changes will require the States to invoke those provisos is, of course, a matter to be decided by State officials. However, since the prior provisions of section 3304(a)(15) are more restrictive than the revised provisions, a State law which contains the elements of the prior provision would nevertheless continue to be consistent with section 3304(a)(15) as amended. Therefore, it is strongly recommended that States take action or refrain from taking action under such provisos only if it is assured that the State law will meet the requirements of section 3304(a)(15), as amended by P.L. 96–364. The States are urged not to take action which would have the effect of leaving the State without any pension deduction provision because that would immediately place the State in the position of having its law inconsistent with the requirements in section 3304(a)(15). In this case, the State should refrain from taking any action until the State legislature has had the opportunity to amend the law to assure consistency with the Federal requirement and thereby avoid any period in which the State law does not meet those requirements.

5. *Amendment to Section 202 of the Federal-State Extended Unemployment Compensation Act of 1970.* Section 416 of P.L. 96–364 amended section 202 of the Federal-State Extended Unemployment Compensation Act of 1970 by adding a new subsection (c) which prohibits payment of extended benefits pursuant to an interstate claim if the claim was filed in an agent-State where an extended benefit period was not in effect. However, the first 2 weeks of extended benefits otherwise payable under such a claim must still be paid to an individual since the prohibition applies only to weeks beyond that period.

New subsection (c) of section 202 reads as follows:

"(c)(1) Except as provided in paragraph (2), payment of extended compensation shall not be made to any individual for any week if—

"(A) extended compensation would (but for this subsection) have been payable for such week pursuant to an interstate claim filed in any State under the interstate benefit payment plan, and

"(B) an extended benefit period is not in effect for such week in such State.

"(2) Paragraph (1) shall not apply with respect to the first 2 weeks for which extended compensation is payable (determined without regard to this subsection) pursuant to an interstate claim filed under the interstate benefit payment plan to the individual from the extended compensation account established for the benefit year.

"(3) Section 3304(a)(9)(A) of the Internal Revenue Code of 1954 shall not apply to any denial of compensation required under this subsection."

This is a new Federal requirement that State laws must include in order to satisfy the provisions of section 3304(a)(11), FUTA, requiring payment of extended compensation as provided by the Federal-State Extended Unemployment Compensation Act of 1970. To meet this requirement, a State law must, as specified by Section 416(b), include provisions implementing new subsection (c) of section 202 for any week which begins on and after June 1, 1981, unless the State legislature does not meet in a regular session which begins during 1981 and before April 1, 1981. In that event, the State must implement the requirement for weeks of unemployment beginning on or after June 1, 1982. However, since the amendment is otherwise effective for weeks of unemployment beginning after October 1, 1980, a State has the option to implement the requirement with the week beginning October 5, 1980.

Under the provisions of new subsection (c), when an individual files an interstate claim for extended compensation under the interstate benefit payment plan such compensation shall be paid for the first two compensable weeks but may not be paid for any additional week unless an extended benefit period is in effect in the agent State for such weeks. If a claimant thereafter moves to another agent State and files an interstate claim under the interstate benefit program, he or she may receive extended compensation only if an extended benefit period is in effect for the week compensation is claimed. If such a period in effect, the liable State would be prohibited from paying extended compensation under that claim since the individual will have previously received "the first 2 weeks for which extended compensation is payable" pursuant to an interstate claim filed in a State with an "off" trigger. Since the restriction in new subsection (c) is only applicable to interstate claims filed under the interstate benefit payment plan, it does not apply so as to deny extended compensation to an individual who files a claim classified as either a visiting, transient, or courtesy claim.

When Canada is the agent State, the denial of extended benefits applies to the same extent as for any other claim filed from an agent State that is not in an Extended Benefit Period. Canada is not a party to the Federal-State Extended Unemployment Compensation Act.

The provision in new section 202(c)(3), rendering the requirements in section

3304(a)(9)(A), FUTA, inapplicable to any denial required by these amendments, was included to avoid the conflict that would otherwise have occurred in the Federal law upon enactment of new subsection (c). Paragraph (3) has no other effect.

Procedural instructions for implementing this new requirement and amendments to the current Extended Benefit regulations to reflect these changes will be issued at a later date.

6. *Amendment Relating to Length of Service Needed to Qualify for UCX Benefits.* Section 415 of P.L. 96–364 also amended Title 5 of the United States Code to increase the length of service in the Armed Forces that is required for former members to establish eligibility for unemployment compensation. Under the provisions of subparagraph (A) of section 8521(a)(1) of Title 5, U.S.C., as amended, a service member must now have 365 days or more of active service in order to be eligible for unemployment compensation instead of the 90-day period formerly required by that section. The amendment applies with respect to any new (first) claims filed for unemployment compensation on or after October 1, 1980. Instructions for implementing this change are being provided in a separate document.

The attachment contains draft language which can be used by States to implement the new pension deduction standard and the amendment providing for the cessation of extended benefits in the prescribed circumstances discussed earlier.

7. *UIPL No. 24–80.* This letter supplements UIPL No. 24–80 dealing with the Federal pension deduction standard prior to amendment by P.L. 96–364, except that in those respects in which the two letters are inconsistent, this letter supersedes UIPL No. 24–80.

8. *Action Required.* SESAs are requested to:

a. Take necessary action to assure by change in the State law that pension payments received by claimants are deductible under the State law as required by section 3304(a)(15), FUTA, as amended, and that

extended compensation is denied in the circumstances required by new subsection (c) of section 202 of the Federal-State Extended Unemployment Compensation Act of 1970 as amended; and,

b. Inform the regional offices of the necessity for action or no action invoking provisos included in existing pension deduction provisions which, when invoked, invalidate such provisions, and indicate what other action will be taken to assure that the State law continues to be applied consistent with the requirements of section 3304(a)(15), FUTA, if those provisos are invoked.

9. *Inquiries.* Inquiries should be directed to your regional office.

*Draft Language to Implement Section 3304(a)(15), FUTA, as Amended by P.L. 96–364—Federal Pension Deduction Standard*

The following draft provision provides for reduction of pensions as required by the amendments to section 3304(a)(15), and includes two options for adjusting the pension to take into account contributions made by the individual.

"For any week with respect to which an individual is receiving a pension (which shall include a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment) under a plan maintained or contributed to by a base period or chargeable employer (as determined under applicable law), the weekly benefit amount payable to such individual for such week shall be reduced (but not below zero),

(a) by the pro-rated weekly amount of the pension after deduction of that portion of the pension that is directly attributable to the percentage of the contributions made to the plan by such individual; or

(Alternative to subsection (a))

(a) by one-half the pro-rated weekly amount of the pension if at least half but less than 100 percent of the contributions to the plan were provided by such individual; or

(b) by the entire pro-rated weekly amount of the pension if subsection (a) or subsection (c) does not apply; or

(c) by no part of the pension if the entire contributions to the plan were provided by such individual, or by the individual and an employer (or any other person or organization) who is not a base period or chargeable employer (as determined under applicable law).

(d) No reduction shall be made under this section by reason of the receipt of a pension if the services performed by the individual during the base period (or remuneration received for such services) for such employer did not affect the individual's eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment. The conditions specified by this subsection shall not apply to pensions paid under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of prior law). Payments made under such Acts shall be treated solely in the manner specified by subsections (a), (b) and (c) of this section."

The provisions of the alternative to subsection (a) are designed to facilitate administration of this option by providing a practical means of adjusting the deduction to take into account the individual's contribution to the pension fund without extensive calculations.

*Draft Language to Implement new section 202(c) of the Federal-State Extended Unemployment Compensation Act of 1970 as amended by P.L. 96–364—Cessation of extended benefits paid under an interstate claim in a State when no extended benefit period is in effect.*

Following the enactment of P.L. 91–373, which established the permanent Federal-State extended benefits program, we issued the *Draft Legislation to Implement the Employment Security Amendments of 1970 —H.R. 14705.* Each State received a copy of that document for use in implementing P.L. 91–373. A section was included on pages 119–128 setting forth recommended language to implement the extended benefit program. The following draft language is intended to be incorporated into the framework of that section and should be inserted as new subsection (g).

*"(g)(1) Cessation of extended benefits when paid under an interstate claim in a State where extended benefit period is not in effect.*

Except as provided in paragraph (2), an individual shall not be eligible for extended benefits for any week if:

"(A) extended benefits are payable for such week pursuant to an interstate claim filed in any State under the interstate benefit payment plan, and

"(B) no extended benefit period is in effect for such week in such State.

"(2) Paragraph (1) shall not apply with respect to the first 2 weeks for which extended benefits are payable (determined without regard to this subsection) pursuant to an interstate claim filed under the interstate benefit payment plan to the individual from the extended benefit account established for the individual with respect to the benefit year."

### Text of UIPL 7–81 Change I

1. *Purpose.* To inform SESAs of the interpretation of subparagraph (B) of section 3304(a)(15) of the Federal Unemployment Tax Act giving States the option of limiting by law the amount to be deducted from an individual's weekly benefit entitlement by reason of receipt of a pension payment based on the previous work of the individual, by taking into account the individual's contributions for the pension.

2. *References.* Section 414, P.L. 96–364 (H.R. 3904); UIPL 24–80 and UIPL 7–81.

3. *Background.* UIPL 7–81, issued November 7, 1980, contained an explanation of the amendments to section 3304(a)(15) made by section 414 of P.L. 96–364. With reference to subparagraph (B), relating to the option to take into account employee contributions to pension plans, it was stated on page 5 of UIPL 7–81 that a State may eliminate from the pension amount to be

deducted from a benefit amount payment "any part of the pension payment equivalent to the employee's share of the contributions to the pension fund" or "a representative percentage of the pension," as examples of acceptable types of limitations on pension reduction. In UIPL 7–81 it was further stated that subparagraph (B) gave States "broad latitude" in exercising the option; however, it also contained an expression of the view that any limitation adopted by a State "should be consistent with the basic purpose of the option which is to allow elimination of the individual's share of the contributions to the pension fund in determining the amount of pension to be deducted." In UIPL 24–80, a similar view had been expressed earlier with respect to two bills in Congress late in 1979 and early in 1980 to amend the pension reduction requirement in language identical to subparagraph (B). The view was expressed on page 5 of UIPL 24–80 that State laws "can provide for deduction of a representative percentage of the pension *as determined under the State law.*" (Emphasis added). A more recent decision on the meaning of subparagraph (B) necessitates changes on page 5 of UIPL 7–81, and supersedes the sentence on page 5 of UIPL 24–80 from which the above quote is taken.

Subparagraph (B) is an optional exception to the general rule which requires the deduction of pensions for unemployment benefits dollar for dollar, and is, therefore, to be narrowly construed to effectuate its purpose. Its purpose, as reflected in its legislative history, is to reduce the pension offset amount by an amount "consistent with" or "related to" contributions toward the pension made by the worker. The "flexibility" given to the States, mentioned in the legislative history, refers to the amendments to section 3304(a)(15) which limited the deduction requirement (1) to pension payments made under a plan maintained or contributed to by a base period or chargeable employer, in contrast to pension payments based upon the previous work of the individual in his work history; and (2) to pension payments where eligibility for the pension or the amount of the pension is affect-

ed by work performed after the beginning of the base period (except social security and railroad retirement pensions); and which further gave to the States the option to take into account by their laws contributions made by individuals for their pensions.

Reduction of the pension offset amount is "consistent with" the worker's contributions when, as explained by Congressman Brodhead, one of the conferees on the bill, a State limits "the offset to one-half the amount of the social security pension received by an individual who qualifies for unemployment benefits." *Congressional Record,* page H 9180, September 19, 1980. A similar statement was made and example given by Congressman Corman, Chairman of the Subcommittee on Public Assistance and Unemployment Compensation of the House Ways and Means Committee, which had jurisdiction of the bill, with respect to a provision identical to subparagraph (B) in H.R. 5507, *Congressional Record,* page H 623, February 6, 1980. A similar example was given by Senator Bradley, one of two co-sponsors of the amendment in H.R.3904. *Congressional Record,* page S 12901, September 18, 1980. States would be permitted by the option to reduce the offset amount by "that part of a pension which reflects a return of employee contributions." Senate Report No. 96–472, page 3, December 10, 1979. States would be permitted to apply the reduction "in a manner which provides a reasonable adjustment" to take into account an employee's contributions to the pension plan. *Ibid,* page 12.

4. *Interpretation of Subparagraph (B).* It is clear for this legislative history that it was the intent of Congress to allow States to take into account employee contributions for a pension in an amount up to the proportion by which the employee contributed to the pension plan from which the payments are received. Subparagraph (B) is construed, in accordance with its language and related legislative history, as permitting a State to provide in its law for limiting the pension deduction otherwise required under subparagraph (A) of section 3304(a)(15) by reducing the offset amount

by an amount that is the ratio of the employee's contributions to total contributions to the plan or system by both the employee and his or her employer(s). From the statutory language and the examples given in the legislative history, it is clear that the amount of the pension that may be disregarded may be no greater than such ratio of the employee's contributions.

In the case of pension plans or systems where the employee makes all of the contributions to the principal forming the basis of the pension, none of the pension would be deductible. This is so because if a base period or chargeable employer had not made any financial contribution to the principal of the pension for the employee, the amount received as a pension would not fall within the scope of subparagraph (A)(i) of section 3304(a)(15), and the provisions of subparagraph (B) would not be reached.

5. *Determination of Proportion of Employee Contributions.* It will be necessary in any State law provision that is consistent with subparagraph (B) to provide for reasonably based determinations of the proportion of employee contributions to a pension plan or system, so that the amount of any pension to be disregarded for benefit reduction purposes will not exceed the ratio of the employee's contributions to the total contributions to the principal of the plan or system by the employee and his or her employer(s). Because of the different types of pension plans and systems that exist, and the specific data that may be readily available to SESAs for making determinations of the ratios of employee contributions, it is recommended that the State laws confer broad authority for making reasonably based determinations.

Depending upon the type of plan or system and specific data available, the following rules apply:

    a. *General rule, where proportion of employee contributions to total contributions is known.*

    (1) Add values of total employee and employer contributions to find amount of total contributions.

    (2) Divide amount of total employee contributions by total of all contributions to find proportion of contributions paid by employee.

    (3) Multiply the ratio representing employee contributions by the amount of the employee's weekly pension to find amount of pension attributable to employee contributions.

Example: X, over his working life, contributed $2500 to his employer's (ABC's) defined contribution pension plan. ABC also contributed $7500 to the plan on X's behalf. When X retires, he will receive $100 a week as a pension benefit. The portion of this pension attributable to X's contributions is calculated as follows:

Total amounts contributed on X's behalf: $10,000 ($2500 + $7500).

Ratio of contributions attributable to X: 25% ($2500/$10,000).

Weekly pension amount attributable to X's contributions: $25 (25% × $100).

    b. *Rule where proportions of both employee and employer contributions are known.*

Where the ratio of employee and employer contributions have been fixed at specified proportions in the plan or system over a substantial period of time preceding the employee's retirement, such ratio can be adopted without further determination for the purposes of a subparagraph (B) type of provision. For example, under the system for primary social security and Federal civil service retirement, the employee contributions are set at 50 percent, and it is not necessary to inquire any further.

    c. *Rule where amount of employer contributions is not known.*

In situations where it is not possible to determine exactly the aggregate amount of employer contributions paid to a pension plan on an individual's behalf (as often is the case where the employee participates in a defined benefit plan), any method of computation that reasonably reflects or approximates the proportion of contributions made by the employee will be acceptable.

6. *Scope of Letter.* The interpretations contained in this letter apply solely to section 3304(a)(15), FUTA, and have no application to any other Federal statute.

7. *Revised Page 5.* This letter transmits a change to page 5 of UIPL 7–81.

8. *Action Required.* SESAs are requested to substitute the attached page 5 for the one contained in UIPL 7–81, November 7, 1980, and retain this Change 1 to UIPL 7–81. The substituted text is in the first paragraph. There are, in addition, revisions in the second paragraph for consistency with the changes in the first paragraph.

The interpretations contained in this letter are effective for the certification period beginning November 1, 1980. SESAs should apply these interpretations as soon as possible after receipt of this letter.

9. *Inquiries.* Questions should be directed to the appropriate Regional Office.

Attachment.

### Text of UIPL 24–80

1. *Purpose.* To inform State Employment Security Agencies (SESAs) of the requirements of the pension deduction provision of Section 3304(a)(15), FUTA, the Federal law provision that will become effective for weeks of unemployment beginning after March 31, 1980.

2. *Reference.* UIPL 10–77 and 37–79; Draft Language and Commentary to Implement the UC Amendments of 1976, page 61, and Supplement # 1, Q and A's 3 and 4, pages 29–30.

3. *Background.* Public Law 94–566 added Section 3304(a)(15) to the Federal Unemployment Tax Act (FUTA) requiring States, for weeks of unemployment beginning after September 30, 1979, to reduce an individual's weekly benefit amount by the weekly amount of a "governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual . . . ." The effective date of this provision was extended by P.L. 95–19 to March 31, 1980. Although Congress is currently considering bills that would amend this provision of Federal law, as the SESAs were informed by the Regional Administrators following our telegram to them on January 14, 1980, there is no assurance that final Congressional action will occur before the current provision in Section 3304(a)(15) takes effect.

As we indicated in that telegram, both the Senate Finance Committee and the House Ways and Means Committee have reported out pension deduction provisions (H.R.4612 and H.R.5507, respectively) which differ only in effective dates. Under both bills, the present FUTA provision would be retained with provisos to: (a) require States to apply the provision to payments made under a plan maintained or contributed to by a base-period or chargeable employer (although States would be permitted to apply the deduction to payments made by any employer); and (b) permit States to reduce benefits on less than a dollar-for-dollar basis to take into account the contributions made by the worker to the plan from which payments are made. The Senate version would be effective for weeks of unemployment beginning after January 1, 1980; the House version for weeks of unemployment beginning after January 1, 1982.

We recommended in the telegram the following provisions to provide for maximum flexibility consistent with the proposals now under consideration in Congress:

"The amount of benefits payable to an individual for any week which begins after the effective date of the applicable provision in the Federal Unemployment Tax Act and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week; provided that, if the provisions of the Federal Unemployment Tax Act permit, the executive director may prescribe in regulations which are consistent with the

Federal Unemployment Tax Act that—(a) the requirements of this paragraph shall only apply in the case of a pension, retirement or retired pay, annuity, or other similar periodic payment under a plan maintained (or contributed to) by a base period or chargeable employer (as determined under this Act), and/or that (b) the amount of any such reduction shall be determined taking into account contributions made by the individual for the pension, retirement or retired pay, annuity or other similar periodic payment."

4. *Discussion.* Many questions have been received as to the scope of the language now in the Federal law—specifically, what kinds of payments are required to be deducted, how are lump-sum retirement payments handled, how does retroactive payment of pensions effect benefits already received, how is the pension deduction applied when only one of several employers provided a pension?

First, because the Federal language specifies that the reduction must occur for payments" ... based on the previous work of such individual ...," the reduction applies only to pensions or annuities collected by the person who actually earned them. It does not apply to, for example, a survivor's or widow's pension that is payable to a survivor or widow but not based on the previous work of that individual. No exhaustive list of the kinds of payments that are deductible is available; however, based on the broad language of the provision, we believe that the following must be deductible; primary social security old age and disability retirement benefits, including those based on self-employment; State and local government pensions of all types; Federal Civil Service pensions, including disability pensions; private for-profit employer pensions; military retirement pensions and disability retirement pensions; and Railroad Retirement annuities. Also included are benefits derived from IRA and Keogh plans on the basis that these benefits are the result of the individual's previous work, and, while they may be participated in by both employer and employee, are generally payable only because the individual,

while employed, was not covered by any other pension plan but, instead, established his or her own pension plan with money set aside and exempt from tax for that purpose. Military service-connected disability compensation payable under 38 U.S.C. Chapter 11 is not deductible because it is based on disability rather than on the previous work of the individual, and bears no direct relationship to the level of prior remuneration or the length of the past service. Other types of disability compensation, such as temporary disability insurance and workers' compensation (including Black lung benefits), which are not payable as a retirement or pension payment, also are not required by Section 3304(a)(15) to be deducted from unemployment compensation.

Second, as to lump-sum retirement payments, the States have the option as to whether to treat them as "similar periodic payments" which are deductible under their laws, and if they treat them as such periodic payments they have the further option of providing in their laws whether the payments shall apply only to the week in which they were paid, or to the week following the last week worked prior to retirement, or whether they shall be allocated to the weeks or months or other applicable periods following the last week worked prior to retirement. Severance pay and separation payments are not required to be treated as lump sum retirement payments, or as any other form of retirement, pension, or annuity required by Section 3304(a)(15) to be deducted from unemployment compensation.

Third, retroactive payment of pensions for weeks in which the individual has already received unemployment compensation may be treated as causing overpayments under the provisions of the State law applicable to benefit overpayments, as appropriate under the State law. The reason for this is that, under the Federal law provision, the deduction is required to apply only to weeks in which the individual is receiving the pension. Therefore, unemployment compensation payments made for any week for which pension payments are retroactively made

may be recovered by the State agency, subject to waiver of recovery if applicable under the State law, or the State agency may choose not to recover benefits that were paid for weeks with respect to which the claimant receives a retroactive payment of Social Security or other retirement benefits.

Fourth, unless the Federal law is amended as described earlier, States will be expected to deduct from the weekly benefit amount the full amount of any pension received from any employer in the claimant's work history. Should the Federal law be amended, the full amount of pension received must be deducted from the weekly benefit amount, but the deduction may be limited to pensions maintained or contributed to by a base-period or chargeable employer. In a survey of current practice in the States with pension deduction provisions, it was found that one State prorates the amount of the pension to be deducted in cases where a claimant has more than one base-period employer but not all of those employers have contributed to the pension being received by the claimant. Under the provisions of Section 3304(a)(15), FUTA, this practice is no longer acceptable. It was found that most States make a dollar-for-dollar reduction by the amount of the pension payment received regardless of the proportion of base-period wages paid by the pension-providing employer. In any event, States must deduct, dollar-for-dollar, the amount of any pension payment received without regard to the proportion of base period wages that may have been paid by the employer who contributed to or maintained the pension.

Absent amendment to Section 3304(a)(15), FUTA, employee contributions to the pension plan, whether OASI, Civil Service, or private, cannot be taken into account in determining the amount of the reduction. The total weekly prorated amount of the pension must be deducted from the weekly benefit amount otherwise payable. Should the Federal law be amended as indicated in the telegram referred to above, States will be free to take into account, in determining the amount of the deduction, the employee's

contribution to the retirement plan. In such cases the State can provide for not deducting any part of an employee-contributed pension, or it can provide for deduction of a representative percentage of the pension as determined under the State law.

SESA's may want to accumulate information on pension recipients in their data base in preparation for implementing this provision.

5. *Action Required.* State administrators are requested to: (a) Insure that the State law conforms to the Federal law requirements, and (b) construe their laws to provide for deduction of at least those types of payments discussed above.

6. *Inquiries.* Questions should be addressed to the appropriate Regional Office.