Lt. Col. Vincent **PUGLISI** et al.

v.

The **UNITED STATES.**

Nos. 275–76 through 281–76, 386–76 through 388–76.

United States Court of Claims.

Oct. 19, 1977.

ficers they are permitted to receive their full civilian pay but, pursuant to the Dual Compensation Act of 1964, now 5 U.S.C. § 5532(b) (1970), their retirement pay is substantially reduced.[1] Retired reserve officers, on the other hand, are exempted from the Dual Compensation Act and therefore allowed to receive their full civilian pay and full retirement pay simultaneously. 5 U.S.C. § 5534. In this suit for the amount of retirement pay withheld from them, claimants assert that the Act is unconstitutional, especially because it distinguishes between retired regular officers and retired reserve officers to the detriment of the former group. Defendant has moved to dismiss the petitions and plaintiffs have cross-moved for summary judgment. Only legal issues are raised, and the case is ready for disposition.

### A.

Before we consider the arguments pro and con, we set forth a brief summary of the long history of the federal government's dual compensation legislation. The various forms of those laws date back to 1839. See 9 Op.Att'y Gen. 123 (1857) and 9 Op.Att'y Gen. 507 (1860); Sharp, *Dual Compensation and Employment Study,* American Law Division, Library of Congress, *109* Cong.Rec. 9546 (1963). The Supreme Court held that the primary purpose of the earlier provisions was to prevent a person holding a job setting definite compensation from receiving extra pay for additional services which might and should have become part of his regular duties. See, *United States v. Saunders,* 120 U.S. 126, 129, 7 S.Ct. 467, 30 L.Ed. 594 (1887). The Court there ruled that under the then prevailing law it was proper for someone to perform two distinct jobs concurrently and receive the salary for each; it was the Court's opinion, however, that the then-existing legislation prevented an officeholder adding on to his salary payments for "extra" duties which may not

John A. Everhard, Washington, D. C., attorney of record, for plaintiffs; Thomas H. King, Washington, D. C., of counsel.

Richard J. Webber, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## ON DEFENDANT'S MOTION TO DISMISS THE PETITION AND ON PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

Plaintiffs are retired regular officers of various components of the uniformed services who hold civilian positions with the federal government. As retired regular of-

---

**1.** 5 U.S.C. § 5532(b) provides generally that a retired regular officer may receive full civilian pay but his retirement pay shall be reduced to an annual rate equal to the first $2,000 of retirement pay plus one-half of any remainder. Certain exceptions and exemptions are provided for in § 5532(c) and (d). See *infra.*

have been clearly designated in his original job description.

The next important dual compensation provision appeared in the Dual Office Act of 1894, ch. 174, § 2, 28 Stat. 162, 205, which the defendant sees as the forerunner of the 1964 Act with which we are now concerned. This 1894 statute declared that no one holding an office which paid $2,500 or more could be appointed to any other office to which compensation was attached. A retired officer of the regular armed forces was deemed an officeholder within the 1894 Act.[2] According to a modern-day observer, one reason for the 1894 law was to prevent abuse by officers using their military positions to obtain lucrative civil service jobs upon retirement.[3] If that intent can be ascribed to the 1894 Congress, then the Act, at least in large measure, was a "dual office" act designed to prohibit the holding of more than one high federal office. As we judge it, however, the purpose of the 1894 Act was more than that—not only to prevent those abuses but also to limit the total compensation receivable by any one person from the Government. The 1894 Act, although called the Dual Office Act, did not expressly prohibit dual officeholding (by retired military officers or others) *qua* officeholding. Instead, the Act set dollar limits on total salary. Under it a retired regular officer receiving retirement pay of $2,500 or more could not hold any other paid federal office. But according to H.R. Rep. No. 890, 88th Cong., 1st Sess., p. 4

(Nov. 7, 1963), the 1894 Act, when passed, did not prevent many retired regular officers from holding dual office because retirement allowances and federal civilian salaries were most often less than $2,500 each. As time went on and compensation rose, the prohibition bit deeper.[4] The next significant dual compensation provision, relevant here, was part of the Economy Act of 1932, Ch. 314, § 212, 47 Stat. 382, 406, which plaintiffs stress (it is discussed more fully, *infra*). This measure allowed a $3,000 maximum total federal compensation for retired officers holding civilian government jobs (an amount raised to $10,000 by amendment in 1955 (Act of Aug. 4, 1955, ch. 561, § 2, 69 Stat. 497, 498)); it also excepted retired reserve officers and regular officers retired for disability incurred in the line of duty.

Against this background, Congress passed the 1964 Act, part of which is now before us.[5] According to 5 U.S.C. § 5533, no one (with some exceptions) may receive the basic pay of more than one full-time civilian position in the federal government. The statute, however, liberalized the previous restrictions on retired regular officers (such as plaintiffs here). 5 U.S.C. § 5532(b), as we have noted, provides that retired regular officers can receive full pay for their civilian positions, subject to an annual reduction in retirement pay equal to the first $2,000 of that pay plus one-half of any remainder.[6] The Act continues the previ-

---

**2.** *See, Hostinsky v. United States,* 292 F.2d 508, 510, 154 Ct.Cl. 443, 446 (1961).

**3.** Testimony of F.J. Scanlon, Nat. Secretary, Fleet Reserve Assoc., Hearing before the Comm. on Post Office and Civil Service, House of Reps., 88th Cong., 1st Sess. (Oct., 1963) on H.R. 7552 at 74.

**4.** By the Act of May 31, 1924, Ch. 214, 43 Stat. 245, the 1894 Act was amended to exclude enlisted men and officers retired because of injuries or incapacity received in the line of duty, but this change did not affect those regular officers like plaintiffs who retired routinely at the completion of their active military careers.

**5.** The 1964 Act, Pub.L.No. 88–448, 78 Stat. 484, was incorporated into the codification of Title 5

of the U.S.Code, Pub.L.No. 89–554, Sept. 6, 1966, 80 Stat. 378, 482, and is now 5 U.S.C. §§ 3326, 3501–3502, 5531–5533, 6303.

**6.** Section 5532(b) also states that "In the operation of the formula for the reduction of retired or retirement pay under this subsection, the amount of $2,000 shall be increased, from time to time, by appropriate percentage, in direct proportion to each increase in retired or retirement pay under section 1401a(b) of title 10 to reflect changes in the Consumer Price Index."

Subsection (c) excepts from coverage regular officers retired for line-of-duty disability or war wounds, as well as temporary or part-time civilian employees, and subsection (d) gives the Civil Service Commission and certain other officials power to grant other exceptions for special or emergency employment needs.

ous rule exempting retired reserve officers from dual compensation restrictions (5 U.S.C. § 5534).

Its legislation history teaches that the 1964 Act was designed to simplify and consolidate previous dual compensation laws (including the 1894 and 1932 Acts), regulations and administrative interpretations. Restrictions on retired regular officers were eased to give those officers a greater chance to fill civilian jobs, an opportunity Congress thought would benefit both the officers and the government.[7] Congress intended, by easing the then restrictions on retired regular officers, to give such persons civilian employment opportunities more in line with those available to retired reserve officers completely unaffected by dual compensation limitations. Congress did not, however, entirely remove the restrictions on dual compensation for retired regular officers. It is this residue which is under attack in this suit.

### B.

▉ Plaintiff's first, and less substantial, challenge is that 5 U.S.C. § 5532(b) constitutes a direct tax upon them, not in proportion to the census, and therefore in violation of article I, section 9, clause 4 of the Constitution.[8] This curious argument is rested on the purported purpose of the Economy Act of 1932, the true forerunner, plaintiffs insist, of the Dual Compensation Act of 1964. According to plaintiffs, the Economy Act was, in reality, a taxing statute designed to "increase" federal revenues during a time of great national financial distress. It is said that the 1932 limitations

on dual compensation were a before-the-fact tax on certain officeholders and but for the goal of exacting this "tax" the compensation ceilings would have been lifted. The argument concludes that, since the 1964 dual compensation Act was a modernization and reenactment of the dual compensation provisions of the Economy Act of 1932, the later enactment is also unconstitutional on the same ground.

There are at least three conclusive answers to claimants' farfetched line of argument. First, the terms of the 1964 Act and its legislative history demonstrate that it was more than a mere application of the Economy Act of 1932. As we have spelled out in Part A, *supra,* one of the basic goals of the later statute was to consolidate and simplify all prior dual compensation laws and regulations in one manageable law. Over 50 separate statutes and 200 Comptroller General (or predecessor) opinions were involved. *See* S.Rep.No. 935, 88th Cong., 2d Sess. (1964), *reprinted in* [1964] U.S.Code Cong. & Admin.News p. 2834. The history also shows that both the 1894 and 1932 Acts were being revised and, in fact, the 1964 Act made more changes with an eye toward the 1894 statute than it did with respect to other prior pieces of legislation. We are convinced that it had a wider purpose and form than mere updating of the 1932 dual compensation legislation, and the sins, if any, of the latter should not be visited on the former.

But even if we were to agree with plaintiffs that the 1932 Economy Act was the direct forebear of and dominant influence upon the 1964 Act, we still could not agree

---

7. The Act's legislative history states that " * * * [T]he Government may be the loser because of these restrictions. Many skilled technicians, retired . . . from the Armed Forces, can be effectively utilized in civilian agencies. But because of the restrictions of present law, the Government cannot even offer these people employment even though many of them would prefer to remain in public service and are particularly suited to Federal employment. A major source of well-trained prospective employees is completely unavailable." S.Rep.No. 935, 88th Cong., 2d Sess. 2 (1964)

*reprinted in* [1964] U.S.Code Cong. & Admin. News p. 2835.

8. This constitutional provision states:

No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration herein before directed to be taken.

The clause was modified, of course, by the Sixteenth Amendment giving Congress power to tax income without regard to apportionment among the states or census count.

that that statute was in any legal sense a tax measure. Of course, the Economy Act need not have been part of a "Tax Act of 1932" in order to impose, in reality, a direct tax. We assume that in applying article I, section 9, clause 4, the Supreme Court would look to substance rather than form. *Cf., e. g., American Oil Co. v. Neill,* 380 U.S. 451, 455, 85 S.Ct. 1130, 14 L.Ed.2d 1 (1965); *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 443, 61 S.Ct. 246, 85 L.Ed. 267 (1940); *Western Union Tel. Co. v. Kansas,* 216 U.S. 1, 30, 30 S.Ct. 190, 54 L.Ed. 355 (1910); *Galveston, Harrisburg Ry. v. Texas,* 210 U.S. 217, 227, 28 S.Ct. 638, 52 L.Ed. 1031 (1908); *Henderson v. Mayor of New York,* 92 U.S. 259, 268, 23 L.Ed. 543 (1876). But here the substance was in direct historical descent from a long-standing policy limiting dual opportunities to receive pay from the federal government—a qualification upon federal employment and compensation, rather than a tax, direct or otherwise. Moreover, the debates prove that the 1932 Act (which not only contained a stringent ceiling on dual compensation but also provided for compulsory retirements, impoundment of appropriations, and reduced federal travel allowances) was enacted not as, but in lieu of, stringent tax measures. The objective was to restrict the overall expenditure of federal monies, thus alleviating to some extent the need to tax the general public in order to bring revenues back into the Treasury. One Congressman pointed out that the underlying intent was relief from taxation:

I am opposed to adding greater burdens and additional taxation upon the already overtaxed people. [Rep. Sabath, 75 Cong. Rec. 9076, April 27, 1932].

Another said:

Rather than do this [increase taxes], let us cut the expenses of this Government $243,000,000 . . . [W]e must . . tax . . . more or cut . . . ex-

penses . . . . [75 Cong.Rec. 8077–78, April 12, 1932].

Plaintiffs attempt to turn legislation designed to restrict federal expenditures into a tax measure by saying that the Act necessarily levied a tax accomplished through deprivation of putative increased benefits to retired officers like plaintiffs, and therefore became a revenue-producing device. This interpretation obviously strains the accepted legal definition of taxation to the bursting point, and would put in doubt any Congressional attempt to decrease or maintain through the appropriation mechanism statutorily-created benefits to recipients as a class. As many courts have said, a tax in legal contemplation is an exaction, taking money from the taxpayer for public purposes; it is an enforced proportional contribution of money or other property. The 1932 Act did not take from retired officers any money or property to which they were entitled.[9] It simply closed off to them, partially, another source of federal compensation (*i. e.,* federal civilian pay) which Congress felt they should not also have.

Thirdly, even if we accepted plaintiffs' extraordinary notion that the 1932 Act imposed a direct tax upon retired officers, we would have to hold that the "tax", since it affected income received from the government, was an income tax within the Sixteenth Amendment. *See Simmons v. United States,* 308 F.2d 160, 167–68 (4th Cir. 1962).

C.

The claimants' major attack on the dual compensation law is that it treats retired regular officers differently from retired reserve officers with respect to holding federal civilian positions. The latter do not lose any retirement pay if they take a civilian post while regular officers have their retirement pay cut down. This is said to violate the equal protection component incorporat-

---

**9.** At least if retirement pay is not reduced in monetary terms from the level when the serviceman retired, even a retired officer has no vested or contractual right to any particular amount of retirement pay. *Andrews v. United States,* 175 Ct.Cl. 561, 562–63 (1966); *cf. United States v. Larionoff,* 431 U.S. 864, p. 878,

ed into the Fifth Amendment's Due Process clause.[10]

■ Under the Supreme Court's prevailing formulation the validity of the classification drawn by Congress in the dual compensation statute is to be examined under the "rational basis" standard—whether it is rationally related both to a legitimate governmental interest and to the objective of the particular legislation. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 813–14, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976); *Johnson v. Robison,* 415 U.S. 361, 374–75, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). "Strict scrutiny" is not appropriate since the separate classification of retired regular officers is certainly not "drawn upon inherently suspect distinctions such as race, religion, or alienage" (*New Orleans v. Dukes, supra,* 427 U.S. at 303, 96 S.Ct. at 2517; *see also Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. at 313–14, 96 S.Ct. 2562),[11] and the right to

governmental employment is not *per se* "fundamental" in the constitutional sense. See *Massachusetts Board of Retirement v. Murgia, supra,* at 313, 96 S.Ct. 2562; *Fredrick v. United States, supra,* 507 F.2d at 1266, 205 Ct.Cl. at 797.

■ One obvious purpose of the 1964 dual compensation law, as it was of the predecessor statutes, is in general to put a ceiling on the amount of compensation certain classes of individuals can receive from the federal government. This is, of course, a proper object of congressional concern. Setting the pay of federal officers and employees is, historically and constitutionally, within Congress's power. *Atkins v. United States,* 556 F.2d 1028, 214 Ct.Cl. —— (1977). No one could gainsay Congress's authority to provide prospectively that all retired officers could hold a federal civilian position only at the cost of losing part or all of their retirement pay.[12] The only question is whether the statutory distinction challenged here—between retired regular and retired reserve officers—has rational support within an over-all project for limiting federal compensation and restricting dual office-holding.

While legislation over the years has made the conditions of service for regular and reserve officers more comparable,[13] impor-

97 S.Ct. 2150, 53 L.Ed.2d 48; *United States v. Teller,* 107 U.S. 64, 68, 27 L.Ed. 352 (1883).

**10.** On this incorporation, *see, e. g., Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Bruinooge v. United States,* 550 F.2d 624, 626, 213 Ct.Cl. ——, —— (1977); *Fredrick v. United States,* 507 F.2d 1264, 1266 n. 1, 205 Ct.Cl. 791, 796 n. 1 (1974).

**11.** In *Bruinooge v. United States, supra,* we applied the rational basis standard to a statute differentiating the whole class of military commissioned officers from that of non-officers.

**12.** Plaintiffs do not contest the right of Congress to reduce retirement pay for military personnel taking federal civilian jobs, if that is done non-discriminatorily. In view of the congressional right to limit total federal compensation, such across-the-board reduction would seem no more invalid than a flat prohibition on dual employment or a requirement that a new employer or officer divest himself of property which could cause a conflict-of-interest.

**13.** Plaintiffs claim that by 1964 large numbers of reserve officers served full time in the military "under conditions identical in every respect to Regular officers." For example, they assert, reserve and regular officers receive the same kind of retirement privileges and benefits including the same identification cards, medical and commissary privileges, club memberships and airlift privileges. However, these similarities (and others of the same nature), to the extent they exist, do not make the two groups of officers virtually identical for all purposes. *See Taussig v. McNamara,* 219 F.Supp. 757, 761–62 (D.D.C.1963), *aff'd generally,* D.C.Cir., *cert. denied,* 379 U.S. 834, 85 S.Ct. 65, 13 L.Ed.2d 41 (1964), upholding the validity of legislation (a) prohibiting a retired regular, but not a retired reserve, officer from participating in sales to the department in whose service he holds retired status, and (b) subjecting retired regular officers (but not retired reservists) to continuing court-martial jurisdiction.

Moreover, while it is true that there are many retired reservists who have served long periods

tant distinctions, relevant to dual compensation considerations, still exist. *See, e. g., Dandridge v. Williams, supra,* 397 U.S. at 485, 90 S.Ct. 1153. The more lenient treatment of retired reserve officers for dual compensation purposes can be justified on two principal grounds. First, according to military regulations,[14] regular officers can normally serve longer and receive significantly higher retirement pay than reserve officers. As one Congressman noted for the record:

> They [retired regular officers] are a different group of people. The Regular officers do receive more advancement in their term of service and are allowed to go on for 30 years and receive 75 percent of their base pay when the vast majority of Reserve officers must retire at the end of 20 years and receive 50 percent of their base pay and do this at an earlier stage of life when they still have children in school or college to educate. It is an entirely different situation. [Rep. Broyhill, 110 Cong.Rec. 3018].

Congress, wanting to limit the total government compensation receivable by any one person, reduced the retirement pay of regular officers holding federal civilian jobs, with a view toward bringing their total compensation more in line with that of retire reserve officers in such civilian positions. This was neither wholly unreasonable nor invidious.

The second rational basis for the Act's differentiation between the classes of retired officers is premised on the difference between the military offices they hold. A regular officer who has retired remains a member of the regular armed services (*see, e. g.,* 10 U.S.C. §§ 3504(a), 8504(a) (1970)).[15] A retired reserve officer's status is different—he can be ordered to active duty only in time of war or national emergency after all active reservists have been called. 10

U.S.C. § 672(a) (1970). A retired regular officer, therefore, continues at all times to hold an office in the military—he is already a federal officeholder. That fact was one basis for the virtually complete prohibition of civilian officeholding by them in the past. The 1964 Dual Compensation Act can properly be viewed as some liberalization of the previously very stringent but lawful treatment of retired regular officers rather than as an attempt to continue an invalid discrimination against them. As in *Taussig v. McNamara, supra,* 219 F.Supp. at 761–62, the separation between regular and reserve retired officers is not arbitrary.

Minimizing these grounds for the legislative choice, plaintiffs lean heavily on efforts by the Executive Branch to have the differentiation removed as inequitable. The Cabinet Committee on Federal Staff Retirement System indicated in its 1966 report that the distinction in the dual compensation law between regular and reserve retired officers was contrary to consistency and equity (H.R.Doc.No. 402, 89th Cong., 2d Sess., March 7, 1966); the Committee's staff went a bit further and referred to the "discriminatory treatment of the retired Regular officer vis-a-vis the retired Reserve officer or enlisted member," and could not see "any logical reason" for the "penalty" on the regular officer (Sen.Doc.No. 14, 90th Cong., 1st Sess., Apr. 6, 1967). In 1970 the Department of Defense, asking Congress to eliminate the difference, said that "logic and equity" dictated similar treatment and pointed to the "inconsistency and inequity" of the existing restriction. The Civil Service Commission, labeling the distinction as "discriminatory," wrote to Congress that it would not object to the enactment of legislation removing "this inequity to retired regular officers."[16]

---

on active duty, there are also many others who earned their retirement by part-time duty over a number of years, and never served for any extended time on full-time duty.

14. *See, e. g.,* AR 635–100, § V (3–31), § III (4–20, 21, 25, 26).

15. This court has held that a retired regular officer is validly subject to court-martial jurisdiction. *Hooper v. United States,* 326 F.2d 982, 164 Ct.Cl. 151, *cert. denied,* 377 U.S. 977, 84 S.Ct. 1882, 12 L.Ed.2d 746 (1964).

16. Congress did not accede to these requests to change the dual compensation statute.

■ Like many terms used in the law, the words "discriminatory," "illogical," "unfair" and "inequitable" have different values in different contexts. They are fitting for an agency to use in trying to persuade Congress to change a rule which the agency deems unjust as a matter of good employment policy. But a court's task in evaluating (where the test is the rational basis standard) the constitutional validity of that same rule is quite another function. The court cannot strike down the Congressional choice because it believes Congress erred or made a wrong policy decision or even because the result seems "unfair" in some general sense. If the distinction embodied in the law is reasonably related to a legitimate government interest which Congress seeks to advance, the court must uphold the rule even though it may seem unwise or that a more just system could clearly be devised. See Ohio Bureau of Employment Services v. Hodory, supra; Massachusetts Board of Retirement v. Murgia, supra; Dandridge v. Williams, supra. The "opposed views of public policy are considerations for the legislative choice." North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 167, 94 S.Ct. 407, 414, 38 L.Ed.2d 379 (1973). Congress has the authority to choose, and we cannot impose our own judgment, or that of others within the government, if there is any reasonable basis for what Congress has done. See Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 359–60, 365, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). If the legislature may properly think that an evil is specially acute for one group (such as retired regular officers as a class), it may select that aspect "and apply a remedy there, neglecting the others." See Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 1256 (1955).[17] Similarly, a classification with a rational basis will not be set aside because it is "imperfect" or lacking "mathematical nicety," or because " 'in practice it results in some inequality.' " Dandridge v. Williams, supra, 397 U.S. at 485, 90 S.Ct. at 1161; McGowan v. Maryland, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78, 31 U.S. 337, 55 L.Ed. 369 (1911); Bruinooge v. United States, supra, 213 Ct.Cl. at ——, 550 F.2d at 628.

Finding as we have that there is a rational basis for singling out retired regular officers with respect to dual compensation, we cannot deny to Congress, the legislative branch of the federal government, the right in its own judgment to make that distinction. See Alexander v. Fioto, 430 U.S. 634, 97 S.Ct. 1345, 51 L.Ed.2d 694 (1977). There is no "invidious discrimination" vulnerable to the Fifth Amendment, though the law's impact may seem to us or to others to have elements of unfairness. To remove those possible inequities, plaintiffs and their class must resort to Congress, not to the courts.

■ Aside from the exemption of retired reserve officers, claimants take a glancing blow at the provision of the dual compensation law (5 U.S.C. § 5532(d)) for exceptions for "special or emergency employment needs which otherwise cannot be readily met."[18] This standard for exceptions plainly has rationality and Congress cannot be faulted for permitting leeway in the face of such necessity.[19]

---

17. Dual compensation is a subject to which Congress returns from time to time, and at any moment it "may take one step at a time" and "may select one phase of one field," as it sees the need. Williamson v. Lee Optical Co., supra; Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Geduldig v. Aiello, 417 U.S. 484, 495, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). There are indications that, at the present time, there may be some Congressional interest in applying some type of dual compensation limitation to certain retired reserve officers as well as to retired regulars.

18. The Civil Service Commission, subject to the President's supervision and control, prescribes regulations under which such exceptions can be made within the Executive Branch. The President of the Senate, the Speaker of the House, and the Architect of the Capitol have the same authority for their legislative components. The Administrator of the National Aeronautics and Space Administration also has similar specific authority for not more than 30 exceptions.

19. Plaintiffs also make a convoluted argument that 5 U.S.C. § 5532 violates the Fourteenth Amendment via the Ninth and Tenth Amend-

It is urged, finally, that even if the statute would otherwise be valid it should be read to provide merely for temporary deferment of the withheld portion of the regular's retired pay, rather than for complete elimination of that part. As with the comparable statutory argument in *Alexander v. Fioto, supra,* the text and purpose of this enactment refute the suggested reading. The law provides that, during the period the retired regular officer holds a civilian position, "his retired or retirement pay shall be *reduced*" (emphasis added), not deferred; and reduction is necessary to meet the declared objective of the statute to limit the over-all compensation paid to such officers by the United States. That has been the consistent interpretation since 1964.

For these reasons, we grant defendant's motion to dismiss the petitions and deny plaintiffs' cross-motion for summary judgment. The petitions are dismissed.

ments. This seems to say no more than that, since the distinction between retired regulars and retired reserves is invidiously discriminatory, it could not be made by the states under the Fourteenth Amendment and therefore could not be delegated to the Federal Government under the Ninth and Tenth Amendments. Because we have held, contrary to plaintiffs' contention, that the distinction, as made in this statute, is not invidiously discriminatory, we need not stop to discuss whether the Fourteenth Amendment can ever be invoked against a federal statute.