**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO**

v.

**UNITED STATES of America.**

Civ. No. C–83–1641–A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 21, 1984.

Stuart Kirsch, College Park, Ga., for plaintiff.

Myles Eastwood, Asst. U.S. Atty., Atlanta, Ga., for defendant.

## ORDER

O'KELLEY, District Judge.

Presently pending are plaintiffs' and defendants' cross motions for summary judgment in this action brought pursuant to 28 U.S.C. § 1331. Plaintiffs, military retirees who currently are federal employees under the civil service regulations, challenge the constitutionality of § 301(d) of the Omnibus Budget Reconciliation Act of 1982 (the

Act).[1] This section reduces their civil service pay in an amount equal to the cost of living adjustment (COLA) in their military retirement pay. Plaintiffs also assert that the Office of Personnel Management (OPM) regulations were promulgated contrary to the provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1982), that deductions from lump-sum payments violate both the Constitution and the APA, and that the OPM acted arbitrarily in setting forth methods by which war-disabled veterans may claim their exemptions. During the pendency of this action, Congress repealed § 301(d).[2] Upon review, the court grants defendant's motion for summary judgment, and denies plaintiffs' motion for summary judgment.

■ Contending that § 301(d) violates their equal protection and due process rights, plaintiffs request that the court declare this section unconstitutional. To establish a claim alleging violations of equal protection or due process, a plaintiff must show first that he possesses a property or liberty interest protected by the fifth or fourteenth amendments. *See Hunter v. Florida Parole & Probation Comm'n*, 674 F.2d 847, 848 (11th Cir.1982). Plaintiff then must show that the state or federal government deprived him of the liberty or property interest in violation of due process or equal protection guarantees.

■ In the case at bar, plaintiffs contend that they possess a property interest in their civil service salaries. Specifically, they point out that an agency, pursuant to regulations issued by OPM, may reduce civil service employees' pay "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513. *See also* 5 U.S.C. § 7512 (types of actions covered). Interpreting a predecessor statute contain-

1. The Omnibus Budget Reconciliation Act of 1982, Pub.L. No. 97–253, Title III, § 301(d), 96 Stat. 763, *amended by* Pub.L. No. 97–346, § 3(h), 96 Stat. 1647 (1982) provides as follows:

(d)(1) In the case of any member or former member of a uniformed service who, during any period in fiscal year 1983, 1984, or 1985, is receiving retired or retainer pay and holds a civilian position, there shall be deducted from the pay for such position, in accordance with regulations issued by the Office of Personnel Management, an amount equal to the amount of any increase in such individual's retired or retainer pay pursuant to section 1401a(b) of title 10, United States Code, which takes effect during any of such fiscal years in which he holds such a civilian position and which is allocable to the period of actual employment in such civilian position. For purposes of the preceding sentence, the amount of any increase in any individual's retired or retainer pay which takes effect during any fiscal year shall be determined on the basis of the additional amount such individual receives after the application of the preceding provisions of this section and section 5532(b) and (c) of title 5, United States Code. The amounts so deducted shall be deposited into the general fund of the Treasury of the United States.

(2) For the purpose of this subsection—

(A) the term "uniformed service" has the meaning given that term by section 2101 of title 5, United States Code; and

(B) the term "civilian position" means a position, as defined in section 5531(2) of title 5, United States Code.

(3) This subsection shall not apply to reduce the salary of any person whose compensation may not, under section 1 of article III of the Constitution of the United States, be diminished during such individual's continuance in office.

(4) The deduction from pay required by this subsection does not apply to a member or former member of a uniformed service receiving retired or retainer pay whose retired or retainer pay is computed, in whole or in part, based on disability—

(A) resulting from injury or disease received in line of duty as a direct result of armed conflict; or

(B) caused by an instrumentality of war and incurred in line of duty during a period of war as defined by sections 101 and 301 of title 38, United States Code.

(5) The Secretary of Commerce, the Secretary of Defense, the Secretary of Health and Human Services, or the Secretary of Transportation, as appropriate, shall furnish such information to employing agencies, the Secretary of the Senate, and the Clerk of the House of Representatives as may be necessary for the administration of this subsection.

2. The Deficit Reduction Act of 1984, Pub.L. No. 98–369, Civ. B, Title II, § 2203, 98 Stat. 494 (1984) provides that § 301(d) "is repealed, effective with respect to pay periods beginning after the date of enactment of this Act [July 18, 1984]."

ing the same language, the Supreme Court in *Arnett v. Kennedy*, 416 U.S. 134, 151–52, 94 S.Ct. 1633, 1642–43, 40 L.Ed.2d 15 (1974), determined that a nonprobationary federal employee possessed a property interest in his employment. *See also id.* at 166, 94 S.Ct. at 1650. (Powell, J., concurring) ("The federal statute guaranteeing appellee continued employment absent 'cause' for discharge conferred on him a legitimate claim of entitlement which constituted a 'property' interest under the Fifth Amendment.")

Plaintiffs also argue that other statutory provisions buttress their argument that they possess a protectible property interest in their civil service salaries. For example, at least three statutes provide that employees who perform substantially equal work will receive equal pay. *See* 5 U.S.C. §§ 2301, 5101, 5301(a)(1). These statutes indicate that plaintiffs possess more than a mere unilateral expectation of benefit in their employment with the federal government. Because a mutually recognized entitlement exists, the court finds that plaintiffs have satisfied the initial requirement of demonstrating that a protectible interest in property is present in this case. Therefore, the court will address whether reduction of plaintiffs' civil service pay by the amount of the COLA in their military retirement pay violates the guarantees of due process or equal protection.

■ The Supreme Court has distinguished between due process and equal protection as follows. " 'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. 'Equal protection,' on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437, 2443, 41 L.Ed.2d 341 (1974). The court will address the equal protection issue first.

■ Although the federal government and its agencies are not bound by the equal protection clause of the fourteenth amendment, the due process clause of the fifth amendment imposes similar, if not identical, limitations on government actions. *See e.g., Jean v. Nelson*, 711 F.2d 1455, 1483 (11th Cir.1983). Therefore, if a classification is invalid under the equal protection clause of the fourteenth amendment, it also is inconsistent with the due process clause of the fifth amendment. *NAACP v. Allen*, 493 F.2d 614, 619 n. 6 (5th Cir.1974).

In this action, plaintiffs admit that the validity of the classification of civil servants also receiving military retirement pay should be examined under the rational basis standard—whether it is rationally related to a legitimate governmental interest and to the objective of the particular legislation.[3] *See Puglisi v. United States*, 564 F.2d 403, 409, 215 Ct.Cl. 86 (1977). When a statutory provision does not violate a fundamental right or affect a suspect classification, "the burden is not upon the [government] to establish the rationality of its restriction, but is upon the challenger to show that the restriction is wholly arbitrary." *Karr v. Schmidt*, 460 F.2d 609, 617 (5th Cir.), *cert. denied*, 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972).

Plaintiffs in the instant case argue that a classification based solely upon military retirees in civil service positions is not rationally related to a legitimate governmental purpose. To support this argument plaintiffs assert that they are treated differently than military retirees who are not em-

---

**3.** When examining a claimed denial of equal protection of the law, this court must determine whether the interest asserted is a fundamental right or whether the party is a member of a suspect classification. The classification of civil servants who also receive military retirement pay is not "drawn upon inherently suspect distinctions such as race, religion, or alienage," *see City of New Orleans v. Dukes*, 427 U.S. 297, 303,

96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976), and the right to governmental employment is not per se fundamental in the constitutional sense, *see Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976). The parties agree that strict scrutiny of the classifications is not required. *See Puglisi v. United States*, 564 F.2d 403, 409, 215 Ct.Cl. 86 (1977).

ployed in civil service, and also are treated differently from civil servants not receiving military retirement.

Congress passed the Act to restrain federal spending, thus reducing large budget deficits and rising interest rates, that were plaguing the nation. *See* S.Rep. 97–504, 97th Cong., 2d Sess. 4, *reprinted* in 1982 U.S.Code Cong. & Ad.News 1641, 1643. This purpose certainly is reasonable. One method to accomplish the goal of reduced federal spending was the passage of § 301(d) of the Act. The legislative history reveals that the drafters of § 301(d) expected it to have the following effect:

> the conference report falls short of the instruction by $1 billion, but still represents nearly $4 billion more than what we passed in the House.
>
> The COLA savings are achieved through the following:
>
> . . . .
>
> Third. For military retirees employed in the Federal civil service [the so-called double dippers], the COLA increases would be offset by salary reductions. These are reasonable changes that get at some of the excesses in the program without impacting in any way on those truly relying on these retirement benefits for their existence. Frankly, at some point we are really going to have to take a hard look at this program, because we currently have too many people retiring at too early of an age. It is costing us billions that we simply cannot afford.

Cong. Record—H 6364, August 18, 1982. (daily ed.) (comments by House Minority Leader Robert H. Michel).

The court cannot say that § 301(d) is not rationally related to lowering federal spending, for it clearly would cause some reduction in federal monies paid out. Additionally, Congress has the power to establish pay scales for federal officers and employees. *See McCorkle v. United States*, 559 F.2d 1258, 1260–61 (4th Cir.1977). Federal employees generally serve by appointment, and their rights are a matter of statute. *Kizas v. Webster*, 707 F.2d 524,

535 (D.C.Cir.1983). Clearly, "[n]o one could gainsay Congress' authority to provide prospectively that all retired officers could hold a federal civilian position only at the cost of losing part or all of their retirement pay." *Puglisi*, 564 F.2d at 409. Congress' choice of this method, which is reasonably related to its goal of lowering federal spending, is a rational solution to the perceived problem.

Plaintiffs contend that the classification is arbitrary and illogical, because military retirees who are not employed by the federal government in a civil service position but who are employed in private industry receive the cost of living adjustment. Likewise, civil servants who are not receiving military retirement benefits are permitted to receive their net pay without any reduction while military retirees who are performing the same tasks have their civil service pay reduced.

This court cannot declare that a statute is unconstitutional because the result seems unfair in a general sense. *Puglisi*, 564 F.2d at 411. "If the distinction embodied in the law is reasonably related to a legitimate government interest which Congress seeks to advance, the court must uphold the rule even though it may seem unwise or that a more just system could clearly be devised." *Id.* at 411; *see also Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312–14, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976). If Congress finds that an evil is especially acute for one group, it may select that aspect "and apply a remedy there, neglecting the others." *Puglisi*, 564 at 411 (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)). The classification of military retirees in civil service positions is rational, because this group receives two federal checks. For the above reasons, the court finds that the purpose of § 301(d), reduction of federal spending, is a legitimate governmental concern and is rationally related to Congress' method of alleviating the problem.

Although the statute may further Congress' goal, plaintiffs assert that the practical effect of the statute's implementation has been arbitrary because during the period from October 1983 until January 1984, civil service employees did not receive any COLA in their gross salaries. Therefore, civil servants who are also military retirees could not be considered "double-dippers" during that three-month period. Furthermore, during this period the amount of the COLA reflected in their retirement benefits was deducted from their civil service salary checks. This practice effectively negated any cost of living adjustment for this group of employees. Because other military retirees received their COLA and plaintiffs did not receive a COLA during this time period, plaintiffs contend that Congress' intent in eliminating double-dippers has not been effectuated.

A classification with a rational basis will not be set aside, however, because it is imperfect or lacking "mathematical nicety, or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). The overall effect of Congress' enactment was to eliminate the COLA for military retirees who are employed by the federal government. Congress accomplished this effect by setting up a somewhat awkward system of granting basic retirement benefits plus COLA, and then deducting the amount of the above COLA from the civil service salary of the military retirees. Even though simply denying the COLA in the first instance for the members of this specific group seems more logical, the court cannot find that this classification created by Congress does not rationally achieve the desired purpose of eliminating excessive spending. Accordingly, the court finds that plaintiffs have failed to establish an equal protection violation on this issue.

Plaintiffs also contend that § 301(d) arbitrarily deprives them of due process because it does not specifically modify or repeal past congressional provisions for civilian pay rates. Plaintiffs' argument ignores the fact that Congress can and does reduce pay rates of federal employees. *See United States v. Larionoff*, 431 U.S. 864, 879, 97 S.Ct. 2150, 2159, 53 L.Ed.2d 48 (1977); *Puglisi*, 564 F.2d at 409. The COLA, while constituting income which plaintiffs expected to earn, likewise is subject to prospective reduction or elimination by Congress. *See Puglisi*, 564 F.2d at 409. Additionally, § 301(d) clearly states that it reduces a person's civilian pay by the military retirement COLA received. "[T]here shall be deducted from the [civilian] pay ... an amount equal to the amount of any increase in such individual's retired or retainer pay...." *Id.* This language spells out Congress' intent to reduce civilian pay, an action which it has the power to take.

Because Congress has the right to reduce federal employee pay rates, and clearly has done so in § 301(d), plaintiffs' argument apparently is that the statute, depriving them of a property interest for an improper motive, or by means that are pretextual or arbitrary and capricious, constitutes a substantive due process violation. *Barnett v. Housing Authority of City of Atlanta*, 707 F.2d 1571, 1577 (11th Cir. 1983). Plaintiffs have not convinced the court that Congress enacted § 301(d) for an improper motive or by pretextual, arbitrary, or capricious means. Rather, this court previously found that the provision is rationally related to a legitimate governmental function. Because § 301(d) has been applied in a prospective manner, the court cannot find that the section's application to military retirees' pay is constitutionally infirm under the due process clause.[4]

---

**4.** Plaintiffs also claim that § 301(d) violates those statutes requiring equal pay for equal work. *See, e.g.,* 5 U.S.C. § 2301, 5101, 5301. The court first notes that Congress may reduce pay or benefits of federal employees. *Puglisi,* 564 F.2d at 411. Second, this complaint is based upon the fact that while the COLA for military retirement pensions increased, federal civilian pay did not. Former military members, however, still received equal pay for equal work. For example, a hypothetical retiree receives $25,000 in salary, and $15,000 in military pension. The total income is $40,000. His pension COLA is $5,000. Thus, he receives a $20,-

Plaintiffs also have argued that § 301(d) is unconstitutional under the fifth amendment because it will be deducted from lump-sum payments for military leave, which accrued prior to the enactment of the statute. *See* FPM Letter 553–1 at ¶ 6. Contending that Congress is eliminating compensation for services already performed, plaintiffs assert that the statute deprives them of property without due process.

In *United States v. Larionoff*, the Supreme Court declared that:

> [n]o one disputes that Congress may prospectively reduce the pay of members of the Armed Forces, even if that reduction deprived members of benefits that they had expected to be able to earn.... It is quite a different matter, however, for Congress to deprive a service member of pay due for services already performed, but still owing. In that case, the congressional action would appear in a different constitutional light.

431 U.S. at 879, 97 S.Ct. at 2159. The central question for the court's consideration is whether the lump-sum payment for military leave constitutes deferred compensation, or is an ancilliary fringe benefit afforded to persons employed by the military. Section 5551 of Title 5 allows a lump-sum payment for accumulated and current accrued leave. This section expressly states that "[t]he lump-sum payment shall equal the pay the employee or individual would have received had he remained in the service until expiration of the period of the annual or vacation leave. The lump-sum payment is considered pay for taxation purposes only." 5 U.S.C. § 5551. According to 37 U.S.C. § 501, a member of the armed forces who has accrued leave at the time of discharge, is entitled to be paid for such leave on the basis of basic pay to which he is entitled on the date of discharge. 37 U.S.C. § 501(b)(1). Unused accrued leave for which payment is made is not con-

sidered as service for any purpose. *Id.* § 501(c).

Congress specifically stated that the lump-sum payment is considered pay only for tax purposes, 5 U.S.C. § 5551(a), and that unused leave is not considered service, 37 U.S.C. § 501(c). Additionally, these statutes provide that the lump-sum amount may be paid only upon separation or discharge. 5 U.S.C. § 5551(a); 37 U.S.C. § 501(b)(1). Both statutes provide limitations, 37 U.S.C. § 501(b)(3) (payment for no more than sixty days); 5 U.S.C. § 5551(a) (period of leave not extended due to post-separation holiday). The language of the statutes, set forth above, indicates that they provide a benefit, and not deferred compensation, to government and military employees. As such, this benefit is similar to federal retirement benefits, which generally are not deferred compensation and are subject to change by Congress. *See, e.g., McCarty v. McCarty*, 453 U.S. 210, 222, 101 S.Ct. 2728, 2736, 69 L.Ed.2d 589 (1981) (military retired pay is reduced compensation for reduced current services); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 575, 99 S.Ct. 802, 805, 59 L.Ed.2d 1 (railroad retirement pension subject to modification). Because these benefits are not payment for services rendered, Congress may alter its statutory scheme at any time. Therefore, the court finds that deductions from lump-sum payments do not violate due process concerns.

█ Plaintiffs claim that OPM issued FPM Letters 553–1, 296–92, and 5 CFR 553.101–.107 (collectively the rules) in violation of the APA, 5 U.S.C. § 553. The parties agree that the letters, and the preliminary version of 5 CFR 553.101–.107, were not preceded by notice and comment opportunities, as set forth in § 553(b). They also agree that publication of the items was not made thirty or more days before the effective date. § 553(d). Defendant argues

000 pension, and his salary is reduced to $20,-000. His total income is $40,000. Although he is making less civilian pay, he is receiving more retirement funds, and in effect is making the same as a civilian employee. That Congress

decided to reduce his salary, rather than his pension, may not appear to be the most logical way to proceed. It is reasonable and rationally related to Congress' purposes, however, and thus must stand. *See Puglisi*, 564 F.2d at 411.

that the pronouncements, as interpretative rules, were exempt from the notice and comment, and thirty day provisions pursuant to § 553(b)(A) and (d)(2).[5]

■■■■ Agency rules may be either legislative or interpretative. The former are rules promulgated under express congressional authority, which fill gaps in a complicated regulatory scheme. *American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 559 (D.C.Cir.1983) (APWU). Legislative rules conclusively determine rights, *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C.Cir.1980), create additional conditions to the statutory scheme, *American Trucking Ass'n Inc. v. United States*, 688 F.2d 1337, 1343 (11th Cir.1982) *rev'd on other grounds*, 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), (American Trucking), or substantially modify existing regulations or methodology, *Jean v. Nelson*, 711 F.2d 1455 (11th Cir.1983). Additionally, legislative rules are binding and are valid unless arbitrary, capricious, or an abuse of discretion. *American Trucking*, 688 F.2d at 1341.

■■■■ Interpretative rules are an agency's construction of the statute which it administers, and statements as to what the agency thinks the statute means. They are clarifications or explanations, not modifications, of existing laws. *Jean*, 711 F.2d at 1478. *See, also APWU*, 707 F.2d at 559.

This type of rule is an expression of how the agency interprets and intends to implement a statute, *American Trucking*, 688 F.2d at 1341, and also may define statutory terms, or set forth internal agency procedures concerning implementation of the statute. *Batterton v. Marshall*, 648 F.2d at 702. Legislative [sic] [should be Interpretative] rules are nonbinding, but are entitled to deference from the reviewing court. *American Trucking*, 688 F.2d at 1343.[6]

■■■■ The distinction between interpretative and legislative rules often is blurred. *General Motors Corp. v. Ruckelshaus*, 724 F.2d 979, 985 (D.C.Cir.1983) (GM); *Batterton v. Marshall*, 648 F.2d at 702. Therefore, the courts have set forth a two step test to determine a rule's nature. First, a court must decide whether Congress delegated legislative powers to the agency. Second, a court must divine whether the agency intended to use that power in promulgating the particular rule. *American Trucking*, 688 F.2d at 1344, 1351; *see also APWU* 707 F.2d at 558. In making the latter determination, a court will listen to the agency's pronouncement of the rule as legislative or interpretative, but will honor the agency's characterization only if it reasonably describes what the agency has done. *American Trucking*, 688 F.2d at 1344.[7]

---

5. Plaintiffs also claim that OPM lacked "good cause" to publish its regulations and letters without notice and comment, or thirty days advance notice. *See* 5 U.S.C. § 553(b)(B), (d)(3). The court does not reach this issue, finding that the rules in question are interpretative, and exempt from § 553(b) and (d) requirements. *See* discussion *infra*.

6. The United States Court of Appeals for the Eleventh Circuit prefers to refer to the distinction as between "legislative" and "nonlegislative" rules. *American Trucking*, 688 F.2d at 1342–43 n. 6. Not all nonlegislative rules interpret a statute. *Id.* The court recognized, however, that the distinction usually arises in reference to interpretative rules. *Id.* Because the instant rules are interpretative, this court will use that terminology.

7. Some examples of rules held to be interpretative are *General Motors Corp. v. Ruckelshaus*, 724 F.2d 979 (D.C.Cir.1984) (EPA provisions on recall of cars under statute interpretative); *APWU*, 707 F.2d at 558–59 (method of computing postal service retirement benefits merely interpreted statute); *Cabais v. Egger*, 690 F.2d 234 (D.C.Cir.1982) (Department of Labor letter to states construing statutory language and reminding them of existing duties); *American Trucking*, 688 F.2d at 1341, 1344–47 (Interstate Commerce Commission decision merely implemented and interpreted detailed statutory restrictions concerning independent action, rate bureau agreements, and industry average costs). Legislative rules were found in *Batterton v. Francis*, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977) (statute expressly delegated authority to determine what constitutes "unemployment"); *Cabais*, 690 F.2d at 239 (rules limiting state discretion contrary to statutory command not interpretive); *American Trucking*, 688 F.2d at 1347–48 (rule reversing longstanding practice on special permission authorities, by revoking all outstanding authority, is legisla-

In the instant case, § 301(d) provides that

> [i]n the case of any member or former member of a uniformed service who ... is receiving retired or retainer pay and holds a civilian position, there shall be deducted from the pay ... *in accordance with regulations issued by the Office of Personnel Management,* an amount equal to the amount of any increase in such individual's retired or retainer pay.

§ 301(d)(1) (as amended) (emphasis added). The language of the statute is not helpful in determining whether OPM received legislative rulemaking authority thereunder. It only states that deductions will be made in accord with OPM regulations. A review of the entire provision, however, strengthens the argument that legislative authority was not granted. The amount of the deductions are set forth in the statute itself (§ 301(d)(1)) (the amount of COLA in military retired pay). The persons to whom the statute applies likewise are defined by reference to other statutory provisions. § 301(d)(2)(A), (B) ("uniformed service," "civilian position"). The provision also lists exceptions, § 301(d)(3), (4) (constitutionally protected salaries, war related injuries). This language indicates that Congress intended OPM merely to set forth mechanisms for deductions, to define terms that are not defined ("pay"), and generally to implement the statute. Not present is a mandate to affect or create rights, or additional conditions.

The legislative history of the amendment to § 301(d), Pub.L. 97–346 § 3(h), provides that § 3(h) will give to the OPM "regulatory responsibility for the offsetting of civilian pay by the amount of military pay cost-of-living adjustments." Cong. Record S 12631, September 29, 1982. (daily ed.) (Amend. 1344 to H.R.5145, presented by Senator Baker.) The legislative history also provides that the offset will not result in a net decrease in total pay, and that pay rates would be those used to compute "premium pay, annuities and other pay-connected benefits." *Id.* Thus, the legislative history and statutory language do not clearly indicate a grant of legislative authority.

Because the statutory and legislative history language is unclear as to whether OPM received legislative rulemaking authority, the court proceeds to the second step of the analysis, and finds that OPM intended to promulgate not legislative, but interpretative rules. First, the discussion *supra* indicates that the statutory scheme was substantially complete, and that

---

tive); *Batterton v. Marshall,* 648 F.2d 694, 706 (D.C.Cir.1980) (Department of Labor change in methodology of calculating unemployment for CETA purposes conclusively determines rights, and is legislative). *Alaniz v. Office of Personnel Management,* 728 F.2d 1460, 1467–69 (Fed.Cir. 1984) (OPM changed rates and methodology of COLA); *Brown Express, Inc. v. United States,* 607 F.2d 695, 700 (5th Cir.1979) (Notice of elimination of agency practice was new rule, and did not interpret statute or other rules); *cf., City of Waco v. Environmental Protection Agency,* 620 F.2d 84, 86 (5th Cir.1980) (EPA regulations under Clean Air Act redesignating nonattainment areas implicitly held to be legislative, and good cause exemption not allowed); *United States Steel Corp. v. EPA,* 595 F.2d 207, 213 (5th Cir.1979) (EPA redesignation of nonattainment areas implicitly held to be legislative, harmless error unavailable).

A court also may look to the purpose of the APA requirements, which is to "reintroduce public participation and fairness to affected parties" after delegation of governmental authority to unrepresentative agencies. *Batterton v. Mar-*

shall, 648 F.2d at 703. In the instant case, the rules clearly were interpretative. They were merely the mechanics of the deduction process, and interpretations. In such a situation, public participation would not have been crucial. Indeed, plaintiffs indicated in their response to interrogatory No. 22 that they were not as interested in the computation process, as in the underlying statute's constitutionality.

Some courts have held that a regulation which has a "substantial impact" upon those affected thereby must be preceded by notice and comment, whether it is legislative or interpretative. *Brown Express, Inc. v. United States,* 607 F.2d 695 (5th Cir.1979). This "substantial impact" doctrine has been criticized. *See, e.g., American Transfer & Storage Co. v. Interstate Commerce Comm'n,* 719 F.2d 1283, 1285, n. 4 (5th Cir.1983) (citing K. Davis, Administrative Law Treatise § 6:31 (Supp.1982) (citing other cases criticizing *Brown* ). In the instant case, the court finds that the rules do not have a substantial impact on the affected parties. The statute itself has an effect on retired military civil servants; the rules merely implement that effect.

OPM's function was to work out the mechanics. Second, OPM recognized this and characterized its rules as "implementing" the statute. The rules themselves fit this characterization. *See American Trucking* at 1344. For the most part, the rules reiterate the statute. They also define some statutory terms (5 CFR 553.103) ("basic pay"), (FPM Letter 553–1) ("pay" includes lump sum payments). Statutory definition is clearly a task for interpretative rules. OPM's pronouncements do not add new conditions, nor do they alter any rights not already changed by statute. *Id.* Nothing in the record indicates that OPM intended its pronouncements to carry weight beyond that ordinarily accorded its interpretations. *GM*, 724 F.2d at 985. The rules merely interpret and implement § 301(d), and as such they are interpretative rules exempt from the APA's notice and comment, and thirty day publication requirements.[8]

 Because it has determined that OPM's regulations and letters were interpretative, the court must ascertain whether OPM's interpretations are consistent with the statute. *GM*, 724 F.2d at 988. The court should analyze whether the interpretative rules are reasonable and supportable in light of the statutory language, and legislative history. *Id.* OPM's rules clearly fall within the statute's plain meaning. As stated *supra*, they merely set forth mechanisms to deduct the statutorily required amounts, and provide definitions of statutory terms. These definitions of "basic pay" are reasonable.

Plaintiffs also contend that inclusion of lump-sum payments as pay is arbitrary. The court does not agree, because lump-sum payments are defined as pay, albeit for tax purposes. Additionally, the discussion of lump-sum payments *supra* indicates that such payments are in the nature of retirement benefits. OPM's decision to subject lump-sum payments to the deduction therefore is at least reasonable.

Additionally, plaintiffs assert that OPM's treatment of war-disabled veterans is arbitrary. The court discussed earlier that OPM's rules concerning these individuals were interpretative, *see supra* note 8. The rules provide first for the Defense Manpower Data Center (DMDC) to locate eligible individuals. Those individuals not found automatically are given a method of presenting themselves and claiming their eligibility. This scheme reasonably implements the statutory intent to exempt war-disabled veterans, and in fact provides those whom the government inadvertently excluded with a means to obtain their exemption.[9] These rules clearly attempt to fulfill the statutory plan, and not to eliminate the exemption of war-disabled veterans. Thus the court finds that OPM's rules are interpretative, and are reasonable and supportable.

Congress has broad powers concerning federal employees' statutory benefits. Its exercise of this power in the instant case was constitutionally permissible. OPM's regulations and letters also passed muster. The impact of § 301(d) may seem unfair, but because it is constitutional and legal, redress must be made to Congress, not to

**8.** Plaintiffs cite FPM letter 553–1 defining pay as including lump-sum pay as an example of a legislative pronouncement. Clearly, this definition is interpretative: it is OPM's definition or interpretation of retired or retainer "pay." Additionally, plaintiffs mention the procedures for determining war disabled veterans as being legislative. Again, the OPM letter merely set forth a method of determining those who were exempt from § 301(d). It did not create or destroy exemptions. War-disabled veterans were to follow this procedure if their pay was offset. This procedure was to be used, however, only if the DMDC, which was to ascertain all war-disabled veterans, failed to list them. Finally, the determination of whether a pension was war-re-

lated was to be made based upon existing statutes and the regulations governing awards of pensions. The court finds that OPM's pronouncements on the subject did not modify § 301(d), but merely provided for its interpretation and implementation.

**9.** The Act's legislative history is sparse. *See, e.g.,* H.R.Conf.Rep. 759, 97th Cong., 2d Sess. 76, *reprinted in* 1982 U.S.Code Cong. & Ad.News 1641, 1846, 1870. The history merely points out that the provision will reduce federal spending, but does not discuss the war disabled veteran exemption.

the courts. *Puglisi*, 564 F.2d at 411. The court notes that Congress repealed § 301(d). *See supra* n. 2. A review of the congressional comments and committee reports surrounding passage of the repeal provision do not indicate why Congress repealed § 301(d). The court thus will not assume that Congress repealed the offset provision because it believed the provision to be unconstitutional. At any rate, § 301(d)'s history amply demonstrates that recourse against constitutionally sound, yet allegedly unfair, laws is found in Congress.

The court grants defendant's motion for summary judgment, and denies plaintiffs' motion for summary judgment.